# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE BAKER HUGHES, A GE | ) | |
| COMPANY, DERIVATIVE | ) | C.A. No. 2019-0201-LWW |
| LITIGATION | ) | |

## MEMORANDUM OPINION

Date Submitted: December 19, 2022
Date Decided: April 17, 2023

Michael J. Barry, Jason M. Avellino & Kelly L. Tucker, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Peter B. Andrews, Craig J. Springer, David M. Sborz & Andrew J. Peach, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Jeremy S. Friedman, David F.E. Tejtel & Christopher M. Windover, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; *Counsel for Plaintiffs City of Riviera Beach Police Pension Fund and Richard Schippnick*

A. Thompson Bayliss & Matthew L. Miller, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Karl Stern & Elizabeth M. Devaney, QUINN EMANUEL URQUHART & SULLIVAN LLP, Houston, Texas; *Counsel for the Special Litigation Committee of Baker Hughes Company*

**WILL, Vice Chancellor**

Delaware corporate law centers around the principle that a board of directors manages the business and affairs of a corporation. This managerial authority includes the right to decide whether to pursue a claim on the corporation's behalf. Although directors may be disqualified from exercising judgment with respect to a suit, the board is not powerless. It may authorize a special litigation committee to investigate and determine whether pressing derivative claims is in the company's best interests.

A special litigation committee is a potent tool for a corporation to retain control of a derivative suit, so long as it meets several guidelines. The committee must consist of disinterested and independent directors. The committee, often with assistance from advisors, must undertake a diligent and good faith investigation. It must carefully apply the relevant legal standards to the evidence it uncovers and draw conclusions supported by reasonable bases. If the committee follows these standards, the court will generally support its judgment.

In October 2019, the board of directors of Baker Hughes delegated its authority over the derivative claims in this action to a special litigation committee. It did so after the court made a pleadings stage determination that demand was futile. The sole member of the committee lacked disabling ties to conflicted parties or interests in the underlying transactions and joined the board after motions to dismiss

1

had been filed. The committee retained independent advisors and performed a nine-month investigation.

After completing its investigation, the committee concluded that the court would likely hold that the transactions at issue were entirely fair to Baker Hughes. Given that conclusion, and the costs and burdens incumbent in litigating an entire fairness suit, the committee determined that further prosecution would not be in the best interests of Baker Hughes or its stockholders. A motion to terminate the action followed in October 2020.

The plaintiffs took discovery before filing a brief opposing the motion to terminate. Their opposition raises various challenges to the committee's independence, process, and conclusions. On independence, the plaintiffs scrutinize matters from causal acquaintanceships with non-defendant directors to gifts of wine for virtual happy hours. On process, the plaintiffs critique the committee's decisions about report drafting, document collection, and witness interview tactics. And on conclusions, the plaintiffs mount a series of merits-based attacks. These arguments are strong in number but weak in substance.

To be sure, the committee was imperfect. Having a single member is not ideal. Nor is the fact that the member exchanged a handful of messages with an investigation subject. The committee's report also omits any discussion of the

2

potential transaction advisor conflicts it investigated. But despite these flaws, the committee's independence, the thoroughness of its investigation, and the reasonableness of its conclusions are not in doubt.

The record before me, including live testimony of the committee member, demonstrates that the special litigation committee has met its burden. The motion to terminate is therefore granted.

## I.    FACTUAL BACKGROUND

The following background is drawn from the record submitted by the special litigation committee (the "SLC") and the plaintiffs. This record includes the SLC's report, exhibits to the report, additional documents produced by the SLC to the plaintiffs, three deposition transcripts, and live testimony of the SLC member.[1]

### A.    The 2017 Transactions

On October 30, 2016, Baker Hughes Incorporated ("BHI") and GE Oil & Gas UK Limited ("GE Oil & Gas") entered into a merger agreement.[2] BHI, a Delaware

---

[1] *See* Opening Br. in Supp. of Special Litigation Committee's Mot. to Terminate (Dkt. 105) Ex. A ("SLC Rep."). Citations in the form of "Pls.' Answering Br. Ex. __" refer to exhibits to the Transmittal Affidavit of Michael J. Barry in Support of Plaintiffs' Answering Brief in Opposition to the Special Litigation Committee's Motion to Terminate. Dkts. 138-47. Citations in the form of "SLC's Reply Br. Ex. __" refer to exhibits to the Transmittal Affidavit of Matthew L. Miller in Support of Special Litigation Committee's Reply Brief in Further Support of its Motion to Terminate. Dkt. 150. Where an exhibit lacks internal pagination, pin citations reflect the last three digits of the exhibit's Bates stamp.

[2] SLC Rep. 7, 13. BHI stockholders approved the merger agreement on June 30, 2017.

corporation, was an energy technology and services company.[3] GE Oil & Gas was a wholly-owned oil and gas subsidiary of General Electric Company ("GE").[4]

On July 3, 2017, a series of transactions contemplated by the merger agreement closed (the "2017 Transactions").[5] BHI was converted into a Delaware limited liability company called Baker Hughes, a GE company, LLC ("BHGE, LLC").[6] BHGE, LLC became an operating entity under a newly-formed Delaware corporation called Baker Hughes, a GE company ("Baker Hughes").[7] GE contributed GE Oil & Gas's assets to BHGE, LLC.[8] As consideration for the merger, BHI stockholders received a cash dividend and Baker Hughes Class A common shares, which would trade publicly on the New York Stock Exchange.[9] GE received Baker Hughes Class B common shares and BHGE, LLC common units.[10]

---

[3] *Id.* at 3.

[4] *Id.* at 6.

[5] *Id.* at 13.

[6] Baker Hughes, a GE company, Current Report (Form 8-K12B) (July 3, 2017) at Introduction.

[7] SLC Rep. 13. On October 15, 2019, Baker Hughes, a GE company changed its name to Baker Hughes Company. *See* Baker Hughes Company, Current Report (Form 8-K) (Oct. 17, 2019) at Item 5.03. Baker Hughes Company is also referred to as "Baker Hughes" in this decision.

[8] SLC Rep. 13-14.

[9] *Id.* at 14-15. GE contributed $7.4 billion to fund substantially all of the special dividend.

[10] *Id.*

4

As a result of the 2017 Transactions, GE held 62.5% of the voting rights in Baker Hughes and BHI stockholders held the remaining 37.5%.[11]  BHGE, LLC common units were owned by GE (about 62.5%) and Baker Hughes (about 37.5%), and Baker Hughes managed BHGE, LLC.[12]  Lorenzo Simonelli and Brian Worrell became the Chief Executive Officer and Chief Financial Officer, respectively, of Baker Hughes.[13]

GE and Baker Hughes executed a Stockholders Agreement on the same day the 2017 Transactions closed.  The Stockholders Agreement gave GE the right to designate six of the eleven members of Baker Hughes's board of directors (the "Board"), including the Chairman.[14]  GE would retain that right until a "Trigger Date" on which GE or its affiliates owned less than 50% of Baker Hughes's voting power and GE could no longer consolidate Baker Hughes on its financial statements.[15]  The Board's other five members included BHI's Chief Executive

---

[11] *Id.* at 15.  BHI stockholders held 100% of the economic rights in Baker Hughes; GE held none.  Economic rights included the right to distributions in the event of a liquidation and the right to dividends.  *See* Baker Hughes, a GE company, Current Report (Form 8-K12B) (July 3, 2017) at Ex. 3.1 § 4(C) (Baker Hughes certificate of incorporation describing the difference between Class A and Class B common stock).

[12] SLC Rep. 14-15.

[13] *Id.* at 20.  Before assuming positions at Baker Hughes, Simonelli and Worrell were GE Oil & Gas's CEO and CFO, respectively.

[14] Pls.' Answering Br. Ex. 5 ("Stockholders Agreement") § 3.1(a); *see* SLC Rep. 17.

[15] SLC Rep. 17; Stockholders Agreement §§ 1.1 (defining "Trigger Date"), 3.1(b).

5

Officer and four "Independent Directors."[16]  The Independent Directors would be designated by BHI, "reasonably acceptable to GE," and independent under New York Stock Exchange rules.[17]

GE nominated Jeffrey Immelt (who served as Chairman), W. Geoffrey Beattie, Jamie S. Miller, James J. Mulva, John G. Rice, and Lorenzo Simonelli to the Board.[18]  BHI CEO Martin Craighead also joined the Board, along with Independent Directors Gregory D. Brenneman, Clarence P. Cazalot, Jr., Lynn L. Elsenhans, and J. Larry Nichols.[19]

The Stockholders Agreement further provided for the formation of a Conflicts Committee—a subcommittee of the Board's Governance & Nominating Committee.[20]  The Conflicts Committee consisted of all "Company Independent Directors," meaning the Independent Directors with no substantial ties to GE.[21]  The

---

[16] Stockholders Agreement § 3.1(a); *see* SLC Rep. 17.

[17] Stockholders Agreement §§ 1.1 (defining "Independent Director"), 3.1(a); *see* SLC Rep. 17.

[18] SLC Rep. 18.

[19] *Id.*

[20] *Id.*; Stockholders Agreement § 3.3(d).

[21] Stockholders Agreement §§ 1.1 (defining "Company Independent Director"), 3.3(d); *see* SLC Rep. 18-19.  The Governance & Nominating Committee designated each Company Independent Director after determining that the director: (1) was independent under New York Stock Exchange rules; (2) was not a GE board member; (3) was not an officer or employee of GE or its affiliates; and (4) had no other past or present substantial relationship with GE or its affiliates.  Stockholders Agreement § 1.1; *see* SLC Rep. 18-19.

Conflicts Committee's mandate included reviewing and approving related party transactions.[22]

The Stockholders Agreement imposed a multistage lockup on GE's ability to sell its Baker Hughes stock (the "Lockup").[23] From July 3, 2017 to July 3, 2019, GE could not sell its Baker Hughes stock without Conflicts Committee approval.[24] From July 3, 2019 to July 3, 2022, GE could not sell its Baker Hughes stock in a transaction that would result in any person or group beneficially owning more than 15% voting power.[25] After July 3, 2022, GE could sell freely.[26]

## B. The Original Master Agreement Framework

In connection with the 2017 Transactions, Baker Hughes entered into an array of commercial and other agreements with GE and GE's subsidiaries, known as the Master Agreement Framework.[27] Key aspects of the Master Agreement Framework

---

[22] SLC Rep. 18-19 & n.61; Stockholders Agreement §§ 3.3(d), 4.2(a), 4.5(a).

[23] SLC Rep. 19; Stockholders Agreement § 4.2(a).

[24] SLC Rep. 19; Stockholders Agreement § 4.2(a)(i).

[25] SLC Rep. 19; Stockholders Agreement § 4.2(a)(ii).

[26] There were two minor conditions on GE's sale of its Baker Hughes shares after that point: (1) any buyer must make an offer to other, non-GE stockholders of Baker Hughes on substantially the same terms as those between GE and the buyer; and (2) if the buyer did not offer to buy 100% of Baker Hughes's common stock, then the buyer must agree to assume GE's obligations under the Stockholders Agreement or enter into a stockholders agreement with Baker Hughes on substantially the same terms as the Stockholders Agreement. Stockholders Agreement § 4.2(a)(iii).

[27] SLC Rep. 20-26.

included: the Supply Agreement, through which GE supplied Baker Hughes with a range of products and services—such as gas turbines;[28] the GE Digital Master Products and Services Agreement, under which Baker Hughes obtained certain GE Digital products and services;[29] and the Intercompany Services Agreement, in which GE agreed to provide corporate services to Baker Hughes.[30] Many components of the Master Agreement Framework would terminate on or soon after the Trigger Date.[31]

## C. GE's Strategy Shift

GE was facing a financial crisis around the time the 2017 Transactions closed. The company had accumulated massive debt and saw its stock price plummet.[32] A managerial overhaul and strategic adjustment followed. On August 1, 2017, John Flannery replaced Immelt as GE's CEO.[33] A few months later, on October 2,

---

[28] *Id.* at 21-22.

[29] *Id.* at 24.

[30] *Id.* at 24-25. Other parts of the Master Agreement Framework included the Non-Competition Agreement, the Channel Agreement, the Intellectual Property Cross-License Agreement, and the Tax Matters Agreement. *Id.* at 20-26.

[31] *Id.*

[32] *Id.* at 27-28 & tbl.2; Verified Deriv. Compl. (Dkt. 1) ("Compl.") ¶¶ 29-33.

[33] SLC Rep. 28; Pls.' Answering Br. Ex. 14.

Flannery replaced Immelt as GE's Chairman.[34]  And on November 1, Miller became GE's CFO.[35]

Around the same time, two directors resigned from the Baker Hughes Board: Immelt, a GE designee, and Nichols, Chairman of the Conflicts Committee.[36]  GE and Baker Hughes consequently amended the Stockholders Agreement to reduce the Baker Hughes Board from eleven to nine members and the number of GE-designated directors from six to five.[37]  Simonelli became Chairman of the Board and Cazalot became Chairman of the Conflicts Committee.[38]

On November 13, 2017, Flannery announced a restructuring plan for GE to raise $20 billion through asset sales over the next few years.[39]  He specified that GE was evaluating its "exit options" with respect to Baker Hughes.[40]   This announcement put GE and Baker Hughes's relationship on unsettled ground, sowing worry among Baker Hughes investors, customers, and employees.[41]  Market analysts

---

[34] SLC Rep. 28.

[35] Pls.' Answering Br. Ex. 15.

[36] SLC Rep. 29.

[37] *Id.* at 30.

[38] *Id.* at 29.

[39] *Id.* at 32-33.

[40] *Id.* at 32.

[41] *Id.* at 33-38.

described the uncertainty over GE's position as a "contagion" on Baker Hughes stock.[42] Baker Hughes believed that the GE overhang depressed the price of its shares relative to that of its peers.[43]

### D. Project SAW

From October 2, 2017 to May 10, 2019, the Baker Hughes Board consisted of Brenneman, Cazalot, Craighead, Elsenhans, Beattie, Miller, Mulva, Rice, and Simonelli.[44] The latter five were GE designees and current or former GE executives and directors.[45] The Conflicts Committee consisted of Brenneman, Cazalot, and Elsenhans.[46]

On December 21, 2017, the Conflicts Committee met with Baker Hughes management, including CEO Simonelli and CFO Worrell, to discuss GE's potential exit from Baker Hughes and the retention of outside advisors.[47] After recommendations from Baker Hughes management, the Conflicts Committee

---

[42] *Id.* at 34.

[43] *Id.* at 34-36; *see id.* App. A.

[44] *Id.* at 30.

[45] Beattie had been a GE director since 2009. Miller had been GE's CFO since October 2017 and held various high-level roles at GE since 2008. Mulva had been a GE director since 2008. Rice held various high-level roles at GE since 1978. Simonelli held various high-level roles at GE beginning in 1994 but left GE to become Baker Hughes's CEO on July 3, 2017. *See* Compl. ¶¶ 12, 17-20; SLC Rep. 295-98.

[46] SLC Rep. 29, 211.

[47] *Id.* at 38-39.

retained Lazard Frères & Co. as its financial advisor and Simpson Thacher & Bartlett LLP as its legal advisor.[48]  Baker Hughes selected J.P. Morgan Securities LLC as its financial advisor and Davis Polk & Wardwell LLP as its legal advisor.[49]

In early 2018, Baker Hughes management and the Conflicts Committee launched "Project SAW" to evaluate a potential separation from GE.[50]  The objectives of Project SAW were to minimize uncertainty and any resulting negative effects on Baker Hughes's equity story, limit the overhang caused by GE's ownership stake, reduce operational disruption, renegotiate key commercial agreements, and maintain a strong balance sheet and low leverage.[51]

### E.    The Separation Proposal

During the first five months of 2018, Baker Hughes attempted to engage with GE about a potential separation.[52]  GE was unresponsive, so Baker Hughes decided to prepare a separation proposal on its own.[53]  This approach was driven by Baker Hughes and the Conflicts Committee's view that Baker Hughes had the upper hand

---

[48] *Id.* at 40.

[49] *Id.*

[50] "SAW" was an acronym for "spin and win"—a reference to the fact that GE might spin off its Baker Hughes stake.  *Id.* at 41 & n.148.

[51] *Id.*

[52] *Id.* at 54.

[53] *Id.* at 55.

due to the Lockup and GE's need to address its financial woes.[54] Baker Hughes's leverage would become less potent as the expiration of the Lockup approached, incentivizing it to act quickly to secure favorable terms.[55]

On June 5, 2018, Simonelli sent Flannery an initial separation proposal.[56] Baker Hughes suggested a three-part strategy involving: (1) amendments to the Master Agreement Framework; (2) capital markets transactions that would provide GE with up to $6 billion in liquidity and reduce GE's Baker Hughes stake to just over 50%; and (3) public communication of a "mutually agreed path to separation," potentially through a spin-off or split-off.[57]

### F.    The Separation Negotiations

Flannery and Simonelli met on June 8 to discuss Baker Hughes's proposal.[58] A few weeks later, GE announced that it would work towards "an orderly separation from [Baker Hughes] over the next two to three years."[59]

---

[54] *Id.*; *see also id.* at 81-84, 227-31; *supra* Section I.C (describing GE's financial troubles).

[55] SLC Rep. 84; *see also id.* at 228.

[56] *Id.* at 62.

[57] *Id.* at 64.

[58] *Id.* at 67.

[59] *Id.* at 68.

Negotiations proceeded over the ensuing months. Baker Hughes management—specifically, Simonelli and Worrell—led Project SAW's day-to-day efforts with assistance from J.P. Morgan and Davis Polk.[60] The Conflicts Committee oversaw Project SAW, advised by Lazard and Simpson Thacher.[61] The Conflicts Committee held fourteen formal meetings during this period.[62]

A key aspect of the negotiations involved the aeroderivative gas turbine (AGT) and heavy-duty gas turbine (HDGT) components of the Master Agreement Framework.[63] GE sold AGTs and HDGTs that Baker Hughes installed and serviced for customers.[64] Because the servicing business was highly profitable, Baker Hughes sought to secure long-term access to GE products and technology.[65] Baker Hughes also wanted to serve as the exclusive supplier of GE turbine-based solutions

---

[60] *Id.* at 78-79.

[61] *Id.*

[62] *Id.* at 79.

[63] *Id.* at 85-93; *see also id.* at 259.

[64] AGTs and HDGTs are modified jet engine turbines used in oil and gas compression systems and power generation, respectively. *See* Pls.' Answering Br. Ex. 82 ("Forgione Interview Mem.") at 3.

[65] *See* SLC Rep. 88-91 & nn.333, 345 (noting that up to $1 billion of contribution margin was at risk with AGTs and HDGTs, with most of that coming from the servicing business).

for the oil and gas industry and to obtain a return on its investments in researching and developing turbine technology.[66]

As the parties negotiated changes to the Master Agreement Framework, they also discussed capital markets transactions by which GE would liquidate a portion of its Baker Hughes stock. On September 20, 2018, the parties' financial advisors jointly recommended two "Capital Markets Transactions": (1) Baker Hughes's repurchase of its shares from GE (the "Repurchase"); and (2) GE's sale of Baker Hughes shares in a secondary offering to the public (the "Secondary Public Offering").[67] The Conflicts Committee consistently refused to waive the Lockup and permit the Capital Markets Transactions until GE agreed to acceptable amendments to the Master Agreement Framework.[68]

In the midst of negotiations, on September 30, GE replaced its Chairman and CEO Flannery with Larry Culp.[69]

---

[66] *Id.* at 86-87.

[67] *Id.* at 131-32.

[68] *Id.* at 133-36.

[69] *Id.* at 74.

## G.    The 2018 Transactions

In early November 2018, the parties reached agreement on the Repurchase, the Secondary Public Offering, amendments to the Master Agreement Framework (together, the "2018 Transactions").[70]

On November 12, the Conflicts Committee met to review the 2018 Transactions.[71]   Representatives from Lazard, Simpson Thacher, Baker Hughes management, J.P. Morgan, and Davis Polk also attended the meeting.[72]   After presentations from management and the advisors, the Conflicts Committee approved the 2018 Transactions and a waiver of the Lockup.[73]   Later that day, the Baker Hughes Board approved the 2018 Transactions.[74]

---

[70] *Id.* at 140-46.  The Lockup was waived through an amendment to the Stockholders Agreement.  Only the first stage (not the second or third stages) of the Lockup was waived. *See* Baker Hughes, a GE company, Current Report (Form 8-K) (Nov. 13, 2018) at Ex. 10.4 § 4.2(a).

[71] SLC Rep. 140.  Approval by the Conflicts Committee was required for related party transactions between Baker Hughes and GE and for amendments to the Stockholders Agreement.  *See* Stockholders Agreement §§ 4.5, 7.8.  The Conflicts Committee's "non-approval [was] binding on the [Baker Hughes] Board."  *Id.* § 3.3(d).

[72] SLC Rep. 140.

[73] *Id.* at 142-44.

[74] *Id.* at 144-46.

## H. The Announcement

On November 13, 2018, Baker Hughes announced the 2018 Transactions.[75] Baker Hughes estimated that the amendments to the Master Agreement Framework would cause it to incur "one-time charges related to separation from GE" of approximately $200 to $300 million over three years.[76] The amendments would also have a "slight negative impact" on the company's annual operating margin rates of "approximately 20 to 40 basis points."[77] Baker Hughes estimated that the amendments to the AGT components of the Master Agreement Framework would have the most negative long-term effect on its margins.[78]

Under the original Master Agreement Framework, GE Aviation sold AGTs to Baker Hughes at cost.[79] Under the amended Master Agreement Framework, GE Aviation sold AGTs at a 10% to 25% margin.[80] Baker Hughes expected the higher AGT prices to hurt its business outlook.[81] Still, Baker Hughes believed that it had

---

[75] *Id.* at 146-47.

[76] *Id.*

[77] *Id.* at 147; *see also id.* at 111-12.

[78] *Id.* at 111-12.

[79] *Id.* at 21.

[80] In the 2018 Transactions, Baker Hughes and GE Power contributed assets to form a joint venture for their AGT products and services. This joint venture entered into a new AGT supply agreement with GE Aviation. *Id.* at 96-101, 107.

[81] *Id.* at 260-65.

obtained better-than-market terms and other substantial benefits through the AGT-related amendments.[82]

Other Master Agreement Framework amendments included: a new supply agreement for HDGTs; a transfer of Baker Hughes's industrial steam turbine business to GE; an extension of the original Supply Agreement for certain controls products and services; amendments to the GE Digital Master Products and Services Agreement; a transfer of certain pension liabilities to Baker Hughes; and amendments to the Intercompany Services Agreement.[83]

The Secondary Public Offering (in which GE sold approximately $2.3 billion of its Baker Hughes shares) and the Repurchase (in which Baker Hughes repurchased about $1.5 billion of its shares from GE) closed on November 16, 2018.[84]   GE's stake in Baker Hughes was reduced to 50.4%.

---

[82] For example, Baker Hughes obtained exclusivity provisions, shifted AGT warranties and liabilities to GE Aviation, and received significant intellectual property rights. *Id.* at 112-13, 260-70.  With respect to pricing, the SLC determined that "it would have been impossible for [Baker Hughes] to negotiate better pricing on most AGT aspects of the 2017 Supply Agreement [because] GE Aviation received *no margin*" under the original Master Agreement Framework. *Id.* at 261 (emphasis in original).  The original Master Agreement Framework "reflected legacy pricing from GE [Oil & Gas]'s, and then [Baker Hughes's], status as a subsidiary of GE. . . . [Baker Hughes] expected that a change in its GE subsidiary status would result in pricing changes reflecting [Baker Hughes's] status as a third party vis-a-vis GE." *Id.* at 262.

[83] *Id.* at 114-27.

[84] *Id.* at 148-49, 151 & tbl.11.

## I. The Derivative Litigation

On March 13 and 14, 2019, two Baker Hughes Class A stockholders filed separate derivative actions in this court.[85] Both complaints challenged the fairness of the 2018 Transactions and named GE and the members of the Baker Hughes Board as defendants.[86] On March 21, the court entered a stipulated proposed order consolidating the actions (the "Action") and designating the operative Complaint.[87] The thesis of the Complaint is that GE, driven by its "desperate need for liquidity," exercised its control over Baker Hughes to force Baker Hughes to agree to the 2018 Transactions, which unfairly favored GE.[88]

The Complaint advances three derivative claims. In Count I, the plaintiffs allege that GE breached its duty of loyalty as the controlling stockholder of Baker Hughes.[89] In Count II, the plaintiffs allege that the nine members of the Board

---

[85] *Id.* at 156-58. These actions were originally captioned *Schippnick v. Beattie et al.*, C.A. No. 2019-0201-AGB (Del. Ch.) and *City of Riviera Beach Police Pension Fund v. Beattie et al.*, C.A. No. 2019-0205-AGB (Del. Ch.).

[86] SLC Rep. 156-58.

[87] Dkt. 10.

[88] Compl. ¶¶ 1-8.

[89] *Id.* ¶¶ 71-74.

breached their fiduciary duties by agreeing to the 2018 Transactions.[90]  Count III is a claim for unjust enrichment against GE.[91]

On May 10, Conflicts Committee members Brenneman, Cazalot, and Elsenhans were voluntarily dismissed from the Action without prejudice.[92] Craighead was voluntarily dismissed without prejudice on May 16.[93]  The remaining defendants are GE and GE-designated Board members Beattie, Miller, Mulva, Rice, and Simonelli.

On June 7, the defendants filed motions to dismiss the Complaint.[94]  Nominal defendant Baker Hughes moved to dismiss the Complaint for failure to plead demand futility under Court of Chancery Rule 23.1.[95]  GE and the individual defendants sought dismissal for failure to plead demand futility and for failure to state a claim under Rule 12(b)(6).[96]

---

[90] *Id.* ¶¶ 75-78.

[91] *Id.* ¶¶ 79-82.

[92] Dkt. 29.

[93] Dkt. 32.

[94] Dkts. 34-37.

[95] Dkt. 34.

[96] GE, Beattie, Miller, Mulva, and Rice filed a single motion.  Dkt. 35.  Simonelli moved separately and joined the other motions.  Dkts. 36-37.

On October 8, 2019, Chancellor Bouchard issued a bench ruling that granted the motions in part and denied them in part.[97] He determined that the Complaint adequately pleaded demand futility.[98] He denied the Rule 12(b)(6) motion as to Counts I and II but granted dismissal of Count III.[99] He also observed that the burden of proving entire fairness might shift to the plaintiffs due to the Conflicts Committee's role in negotiating the 2018 Transactions.[100]

## J. The Special Litigation Committee

On October 31, 2019, the Board unanimously adopted resolutions forming a special litigation committee.[101] The resolutions vested the SLC with "the full power and authority of the Board" to investigate and evaluate the allegations and issues raised in the Action.[102] They directed the SLC to "prepare such reports, arrive at such decisions and take such other actions in connection with the [Action] as the [SLC] deems appropriate and in the best interests of [Baker Hughes] and its stockholders, all to the fullest extent that such powers and authority may be

---

[97] *In re Baker Hughes, a GE Co. Deriv. Litig.*, Consol. C.A. No. 2019-0201-AGB (Del. Ch. Oct. 8, 2019) (TRANSCRIPT) (Dkt. 66) ("MTD Ruling").

[98] *Id.* at 97.

[99] *Id.* at 89.

[100] *Id.* at 102 (citing *Kahn v. Lynch*, 638 A.2d 1110, 1117 (Del. 1994)).

[101] SLC Rep. 170; *id.* Ex. 1.

[102] *Id.* at 170.

delegated under Delaware law."[103]  The resolutions stated that "the determinations made by the [SLC] shall be final and binding upon [Baker Hughes]."[104]

Gregory L. Ebel was appointed the SLC's sole member.[105]  Ebel had joined the Board on May 10, 2019 to replace Craighead, who had retired.[106]  Ebel is the Chairman of the Board's Audit Committee and a member of its Governance & Nominating Committee.[107]  He has served in various officer and director roles with several energy companies.[108]  Ebel was paid $15,000 annually for his service on the SLC.[109]

---

[103] *Id.*  The resolutions also authorized the SLC to "engage such accountants and advisors, including its own independent legal counsel and financial advisor, as the [SLC] shall deem necessary or desirable in order to assist it in the discharge of its responsibilities" and provided that Baker Hughes would bear the costs of any advisors retained by the SLC.  *Id.* at 170-71.  The resolutions required the company's officers and employees to "supply the [SLC] and its legal counsel and/or advisors with any and all information requested by the [SLC] or its legal counsel and/or advisors and to cooperate in all respects with the requests of the [SLC]."  *Id.* at 171.

[104] *Id.* at 170.

[105] *Id.* at 171; *id.* Ex. 1.

[106] *Id.* at 171; *see* Baker Hughes, a GE company, Proxy Statement (Schedule 14A) (Mar. 25, 2019) at Cover Page, 7-11; Baker Hughes, a GE company, Current Report (Form 8-K) (May 13, 2019) at Item 5.07.

[107] SLC Rep. 171.

[108] *Id.* at 171-73.

[109] *Id.* at 173.

The SLC retained Quinn Emanuel Urquhart & Sullivan LLP and Abrams & Bayliss LLP to serve as its legal advisors.[110] The SLC selected Quinn Emmanuel based on the firm's representation of Ebel in an unrelated case.[111] The SLC retained The Brattle Group as its financial advisor.[112]

On November 12, 2019, the SLC moved for a stay,[113] which the plaintiffs did not oppose.[114] On December 3, the court granted a stay of the Action until June 1, 2020.[115] The parties agreed to extend the stay twice—first to October 1, 2020, and then to October 15.[116]

## K.    The SLC Investigation and Report

The SLC's investigation lasted nine months.[117] The SLC held seventeen minuted meetings between December 6, 2019 and September 24, 2020.[118] Its

---

[110] *Id.* at 174.

[111] Pls.' Answering Br. Ex. 89 ("Ebel Dep.") at 30-31; Pls.' Answering Br. Ex. 77 at 36 (identifying the prior case as *Morris v. Spectra Energy P'rs (DE) GP, LP*, C.A. No. 12110-VCG (Del. Ch.)).

[112] SLC Rep. 174.

[113] Dkt. 73.

[114] *See* Dkt. 78.

[115] Dkt. 79.

[116] Dkts. 82-83, 96-97.

[117] SLC Rep. 2, 177.

[118] *Id.* at 186-87.

investigation concluded on October 13, 2020 when the SLC prepared a written report, which was revised on January 15, 2021.[119]  The report details the SLC's factual assessments, the applicable legal standards, the merits of the plaintiffs' claims, and other factors considered by the SLC.

The SLC concluded that the court would likely hold that the 2018 Transactions were entirely fair to Baker Hughes.[120]  The SLC weighed the potential costs that the continued prosecution of the Action could have on Baker Hughes, including indemnification and advancement costs, diversion of company resources, and negative publicity.[121]  After considering the factors it deemed relevant, the SLC concluded that "terminating the [] Action with prejudice would best serve the interests of the Company and its stockholders."[122]

---

[119] The revised report dated January 15, 2021 is substantively identical to the October 13, 2020 original report.  *See* Opening Br. in Supp. of the Special Litigation Committee's Mot. to Terminate ("SLC's Opening Br.") (Dkt. 105) at Ex. B (providing a blackline between the revised and the original report).

[120] SLC Rep. 320; *see also id.* at 289-90.

[121] *Id.* at 306-19.

[122] *Id.* at 319-20.

## L. The Motion to Terminate and the Opposition

On October 13, 2020, the SLC moved for an order terminating the Action.[123] The SLC filed an opening brief in support on January 15, 2021.[124] The plaintiffs then pursued discovery to test the independence, good faith, and reasonableness of the SLC's investigation and its conclusions. The SLC produced 12,190 pages of documents to the plaintiffs.[125] The plaintiffs also deposed Ebel and two representatives of Brattle.[126]

On January 12, 2022, the plaintiffs moved to compel additional discovery.[127] I denied this motion except as to documents from Ebel's custodial files focused on his recruitment to the Board.[128]

---

[123] Dkt. 98.

[124] Dkt. 105.

[125] These documents included: the SLC report and exhibits; all other documents the SLC reviewed or relied on in reaching its conclusions; interview memoranda and exhibits; the SLC's minutes and resolutions (redacting work product); Board minutes reflecting Ebel's appointment as a director and SLC member; and all communications between the SLC and others about the investigation. *See In re Baker Hughes, a GE co. Deriv. Litig.*, Consol. C.A. No. 2019-0201-LWW (Del. Ch. Feb. 25, 2022) (TRANSCRIPT) (Dkt. 129) ("MTC Ruling") at 53-54.

[126] The two Brattle representatives were Yvette Austin Smith, Chairman and a Principal of Brattle, and David Hutchings, a Principal of Brattle. *See* Pls.' Answering Br. Ex. 86 ("Hutchings Dep."); Pls.' Answering Br. Ex. 87 ("Smith Dep.").

[127] Dkt. 122.

[128] MTC Ruling 60; *see* Dkt. 128. This Action was reassigned to me in May 2021 after Chancellor Bouchard retired from the bench.

On August 25, the plaintiffs filed an answering brief opposing the SLC's motion to terminate, attaching 109 exhibits.[129] On October 4, the SLC filed a reply brief in further support of its motion to terminate along with seventeen additional exhibits.[130]

On December 19, 2022, I heard oral argument on the motion to terminate.[131] At the hearing, Ebel provided live testimony and was cross-examined by the plaintiffs' counsel.[132]

## II. LEGAL ANALYSIS

Section 141(a) of the Delaware General Corporation Law empowers a board of directors "to make decisions regarding corporate litigation."[133] "Like a fleet of trucks or a factory, a lawsuit is a corporate asset that must be managed by the board consistent with its fiduciary duties."[134] Pleadings stage allegations of board-level

---

[129] Pls.' Answering Br. in Opp'n to the Special Litigation Committee's Mot. to Terminate (Dkt. 137) ("Pls.' Answering Br.").

[130] Reply Br. in Further Supp. of the Special Litigation Committee's Mot. to Terminate (Dkt. 150) ("SLC's Reply Br.").

[131] *See* Dkt. 154.

[132] Trans. of Oral Arg. on Special Litigation Committee's Mot. to Terminate (Dkt. 157) ("Oral Arg. Tr.").

[133] *Zapata Corp. v. Maldonado*, 430 A.2d 779, 786 (Del. 1981); *see* 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors.").

[134] *Diep v. Trimaran Pollo P'rs, L.L.C.*, 280 A.3d 133, 149 (Del. 2022).

conflicts can excuse a stockholder's failure to make a pre-suit demand but do not strip the board of its authority. "The problem is one of member disqualification, not the absence of power in the board."[135] The board still has "one final arrow in its quiver to gain control of the derivative litigation—the special litigation committee."[136]

In *Zapata Corp. v. Maldonado*, the Delaware Supreme Court considered the tension between the board's responsibility under Section 141 to control a corporation's litigation assets and the risk that a conflicted board would seek to terminate a beneficial derivative action.[137] The court crafted a two-step analysis "to find a balancing point where bona fide stockholder power to bring corporate causes of action cannot be unfairly trampled on by the board of directors, but the corporation can rid itself of detrimental litigation."[138]

---

[135] *Zapata*, 430 A.2d at 786.

[136] *Diep*, 280 A.3d at 151; *see Zapata*, 430 A.2d at 786; 8 *Del. C.* § 141(c).

[137] 430 A.2d at 786-77.

[138] *Id.* at 787; *see In re Oracle Corp. Deriv. Litig.*, 808 A.2d 1206, 1210-11 (Del. Ch. 2002) [hereinafter "*Oracle I*"] ("[T]he *Zapata* procedure takes the case away from the [derivative] plaintiff" and "turns his allegations over to special agents appointed on behalf of the corporation for the purpose of making an [] internal investigation of his charges." (quoting *Kaplan v. Wyatt*, 484 A.2d 501, 509 (Del. Ch. 1984), *aff'd*, 499 A.2d 1184 (Del. 1985))).

The first step of the analysis requires the court to "review[] the independence of SLC members and consider[] whether the SLC conducted a good faith investigation of reasonable scope that yielded reasonable bases supporting its conclusions."[139] This step is often dispositive.[140] If the special litigation committee meets its burden under step one, the court can grant dismissal or proceed to the discretionary second step.[141] In the second step, the court applies "its own business judgment" to determine whether dismissal would serve the company's best interests.[142]

## A.    The First Step of *Zapata*

"The first prong of the *Zapata* standard analyzes the independence and good faith of committee members, the quality of its investigation, and the reasonableness of its conclusions."[143] The SLC bears "the burden of demonstrating that there are

[139] *London v. Tyrrell*, 2010 WL 877528, at *11 (Del. Ch. Mar. 11, 2010) (citing *Zapata*, 430 A.2d at 789).

[140] *See*, *e.g.*, *Katell v. Morgan Stanley Grp., Inc.*, 1995 WL 376952, at *13 (Del. Ch. June 15, 1995) (granting a special litigation committee's motion to terminate after a step one analysis); *Kindt v. Lund*, 2003 WL 21453879, at *5 (Del. Ch. May 30, 2003) [hereinafter "*Kindt II*"] (same).

[141] *Kaplan*, 499 A.2d at 1192 ("Proceeding to the second step of the *Zapata* analysis is wholly within the discretion of the court.").

[142] *London*, 2010 WL 877528, at *11 (citing *Zapata*, 430 A.2d at 789).

[143] *In re WeWork Litig.*, 250 A.3d 976, 997 (Del. Ch. 2020) (quoting *Kahn v. Kohlberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 836 (Del. 2011)).

no genuine issues of material fact as to its independence, the reasonableness and good faith of its investigation and that there are reasonable bases for its conclusions."[144]  A "procedural standard akin to a summary judgment inquiry" is applied.[145]  The court considers whether there are disputed issues of material fact about the SLC's independence, the scope of its investigation, or the reasonableness of its conclusions—not about the merits of the claims.[146]

### 1.    The SLC Is Independent.

The court's independence inquiry under *Zapata* is both broad and nuanced.  It looks "beyond determining whether SLC members are under the 'dominion and control' of an interested director" to consider whether any "lesser affiliations" create "a material question of fact as to whether the SLC member can make a totally

---

[144] *London*, 2010 WL 877528, at *11 (citing *Kaplan*, 484 A.2d at 507).

[145] *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 928 (Del. Ch. 2003) [hereinafter, "*Oracle II*"]; *see Zapata*, 430 A.2d at 788 (explaining that an SLC "should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that the moving party is entitled to dismiss as a matter of law"); *Lewis v. Fuqua*, 502 A.2d 962, 966 (Del. Ch. 1985) (same).

[146] *See*, *e.g.*, *Diep*, 280 A.3d at 156; *Kaplan*, 484 A.2d at 519 ("[I]t is the conduct and activity of the [SLC] in making its evaluation of the factual allegations and contentions contained in the plaintiff's complaint which provide the measure for the [SLC's] independence, good faith and investigatory thoroughness.  This is because it is the [SLC] which is under examination at this first-step stage of the proceedings, and not the merits of the plaintiff's cause of action.").

28

unbiased decision."[147]  "The question of independence 'turns on whether a director is, for any substantial reason, incapable of making a decision with only the best interests of the corporation in mind.'"[148]  The court need not conclude that an actual conflict made the SLC "less inclined to find [the plaintiffs' claims] meritorious, only that the connections identified would be on the mind of the SLC members in a way that generates an unacceptable risk of bias."[149]

Although the "substantive contours of the independence doctrine" are similar in the pre-suit demand and special litigation committee contexts, "SLC members are not given the benefit of the doubt as to their impartiality and objectivity."[150]  Rather, the SLC must prove its independence.  That burden is particularly hefty if a single

---

[147] *London*, 2010 WL 877528, at *12 (quoting *Oracle II*, 824 A.2d at 937); *Katell*, 1995 WL 376952, at *7 (explaining that an SLC is "independent when it can base its decision on 'the merits of the issue rather than being governed by extraneous consideration or influences'" (quoting *Kaplan*, 499 A.2d at 1189)).

[148] *Oracle II*, 824 A.2d at 920 (citation and emphasis omitted).

[149] *Id.* at 947.

[150] *London*, 2010 WL 877528, at *13.

member SLC is used.[151]  "[T]he sole member of a one-person special litigation committee" must "meet unyielding standards of diligence and independence."[152]

Here, the Board delegated to the SLC its full authority and power with respect to the Action.[153]  The SLC was authorized to retain independent advisors at Baker Hughes's expense.[154]  Ebel was appointed to the SLC after the Board determined he was uninvolved in the 2018 Transactions and had no personal or business ties to any defendant that compromised his independence.[155]

---

[151] *See Lewis*, 502 A.2d at 967 ("If a single member committee is to be used, the member should, like Caesar's wife, be above reproach.").  In *Lewis*, the court concluded that a one-member special litigation committee had not met its burden of demonstrating its independence.  *Id.* at 936.  The committee member was on the board at the time of the challenged actions, was a named defendant in the lawsuit, and had "numerous political and financial dealings" with the principal defendant who served as CEO and "allegedly control[led] the board."  *Id.* at 966.  The special litigation committee member was also the president of a university that had received a substantial pledge from the company and its CEO.  *Id.* at 967.  Ebel lacks any comparable conflicts.

[152] *Sutherland v. Sutherland*, 2007 WL 1954444, at *3 n.10 (Del. Ch. July 2, 2007) [hereinafter "*Sutherland I*"].

[153] *See* SLC Rep. 170-71; *id.* Ex. 1; *supra* Section I.J.  The plaintiffs argue that the "SLC was formed with the goal of seeking dismissal of Plaintiffs' claims."  Pls.' Answering Br. 73.  The only facts cited in support concern, one, the timing of the SLC's formation shortly after the court's motion to dismiss decision and, two, the role of Baker Hughes's outside counsel in advising the Board on forming the SLC.  *Id.* at 73-74.  But this is typically when and how special litigation committees are created in the first place.  *See Zapata*, 430 A.2d at 786 (observing that "the board, tainted by the self-interest of a majority of its members, can legally delegate its authority to a committee of two disinterested directors"); *Diep*, 280 A.3d at 151 ("[T]he special litigation committee typically comes into existence after demand is excused.").

[154] SLC Rep. 170-71; *id.* Ex. 1.

[155] SLC Rep. 172.

30

Ebel's lack of any disabling self-interest in the challenged events is not in dispute. He did not stand to receive "a personal financial benefit" or face "a materially detrimental impact" from the 2018 Transactions, and he has no ties to GE.[156] He was also unconflicted with respect to the Action, having joined the Board on May 10, 2019—after the defendants moved for dismissal.[157] Thus, the focus of my independence inquiry is on Ebel's relationships with interested parties.[158]

"Independence can be impaired by . . . affiliations [with interested parties] . . . [if] those affiliations are substantial enough to present a material question of fact as to whether the SLC member can make a totally unbiased decision."[159] The plaintiffs point to three affiliations: (1) Ebel's relationship with Simonelli; (2) Ebel's relationship with Cazalot; and (3) the SLC advisors' relationships with GE. I take each in turn and conclude that none raises a genuine issue of material fact about the

[156] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993); *see* Oral Arg. Tr. 9 (Ebel testifying that he has no ties to GE).

[157] SLC Rep. 171-73; *see Sandys v. Pincus*, C.A. No. 9512-CB, at 52 (Del. Ch. Jan. 18, 2019) (TRANSCRIPT) (holding that special litigation members who joined the board after the challenged transactions were independent for *Zapata* purposes). Before joining the SLC, Ebel knew "[v]ery little" about the Action and had no "views about the merits." Oral Arg. Tr. 11-12; *see* Ebel Dep. 25-26.

[158] *See London*, 2010 WL 877528, at *12 ("When an SLC member has no personal interest in the disputed transactions, the Court scrutinizes the members' relationship with the interested directors, as that would be the source of any independence impairment that might exist.").

[159] *Id.*

31

SLC's independence. The SLC has met its burden of establishing its impartiality and objectivity with respect to the Action.

### a. Ebel's Relationship with Simonelli

The plaintiffs' primary challenge to Ebel's independence concerns his relationship with Simonelli. Before joining the Board, Ebel had met Simonelli—as well as Elsenhans and Craighead[160]—at industry events while they were oil and gas industry executives in the Houston, Texas area. Ebel's relationship with Simonelli is best described as an acquaintanceship.[161]

The plaintiffs assert that several emails exchanged between Ebel and Simonelli during the SLC investigation create a material fact issue about Ebel's ability to impartially investigate Simonelli. To be sure, certain of these

---

[160] The plaintiffs voluntarily dismissed Elsenhans and Craighead without prejudice. To the extent that Ebel's relationships with these former defendants are relevant, they are merely acquaintanceships. *See infra* note 161 and accompanying text. Simonelli remains a defendant.

[161] *See Kaplan*, 484 A.2d at 512-13 (determining that an SLC member was independent despite business associations, which exceeded millions of dollars, between entities affiliated with the SLC member and the company where a defendant served as chairman and CEO); *Beam v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004) (concluding in the demand futility context that alleging an interested party and "other directors moved in the same social circles" or "developed business relationships before joining the board" did not provide a basis to infer that the directors lacked independence); *cf. Oracle II*, 824 A.2d at 942-93. This case is unlike *Oracle*, where the court determined that special litigation committee members could not be impartial when considering whether to press insider trading claims against a fellow professor at the university where they taught. *Oracle II*, 824 A.2d at 942-93.

communications should not have occurred.[162] But each is non-substantive, and none impugns Ebel's objectivity or the SLC's integrity.[163]

### i. *The Board Expansion Exchanges*

Between early March and late May 2020, Ebel had three exchanges with Simonelli about the logistics of potentially expanding the SLC. The Board was considering adding directors around this time, which created the possibility of those new directors joining the SLC.[164] Although an expansion of the SLC was a matter of discussion for Ebel and his counsel, the addition of new directors to the Board was a threshold topic.[165] As such, Ebel asked Simonelli—the Board's Chairman— for information.[166]

---

[162] *See In re Primedia Deriv. Litig.*, C.A. No. 1808-VCL, at 54 (Del. Ch. May 12, 2008) (TRANSCRIPT) ("[C]ommunications from the defendants . . . to the committee with respect to the committee's work . . . should be a null set.").

[163] In *Diep*, the Delaware Supreme Court affirmed the Court of Chancery's determination that a special litigation committee was independent. The Court of Chancery held that communications between committee members and interested parties about aspects of the matters under investigation did not give rise to material fact issues. 280 A.3d at 152. One committee member had discussed the derivative action with the manager of the defendant controller. *Id.* at 143. Two other committee members attended a board meeting where the board, including the defendant directors, discussed the derivative action. *Id.* at 153. The communications raised here are even further removed from the merits.

[164] *See* SLC's Reply Br. Ex. A at 1-2; SLC's Reply Br. Ex. C at 2; Ebel Dep. 76-77.

[165] Oral Arg. Tr. 57 (Ebel testifying that "[he] discussed [with Simonelli] the logistics of new directors coming on, not about expanding the SLC"); *see also id.* at 27, 29, 35; Ebel Dep. 105.

[166] Oral Arg. Tr. 27 (Ebel testifying that he "need[ed] information from Mr. Simonelli in connection with [the] consideration of adding another board member . . . just purely

33

The SLC first assessed the possibility of an expansion at a March 2, 2020 SLC meeting.[167] Ebel informed his counsel that Baker Hughes might add a director "in connection with the Baker Hughes annual stockholders meeting in May 2020" or as early as "the next Board meeting in March 2020."[168] Ebel and the SLC's counsel "discussed their preliminary views on the possibility of expanding the SLC to include a new director."[169] The SLC's next steps would depend upon whether and when a new director was added to the Board.[170]

Four days later, on March 6, Ebel emailed Simonelli: "I do need to speak to you about an SLC matter. Your thoughts would be helpful before I reach out to Geoff B[eattie]."[171] Ebel credibly testified that he sought to obtain details about the timing of the potential Board additions.[172] This would have been crucial to whether

___

logistics from that perspective" and "what [he] could [] expect to see in terms of new directors coming on the Baker Hughes board"); *see also id.* at 35; Ebel Dep. 105.

[167] SLC's Reply Br. Ex. A at 1-2.

[168] *See id.* at 1. Ebel testified that he learned of the potential Board expansion through general Board-level discussions. Oral Arg. Tr. 24.

[169] SLC's Reply Br. Ex. A at 1-2.

[170] Oral Arg. Tr. 32-33.

[171] Pls.' Answering Br. Ex. 90 at -077. As Chair of the Governance & Nominating Committee, Beattie was involved in new director recruitment. *See* Pls.' Answering Br. Ex. 77 at 19-20. Ebel could not recall whether he spoke with Beattie but believed that he never had to reach out to him. Ebel Dep. 106.

[172] *See* Oral Arg. Tr. 27. According to the plaintiffs, Ebel's memory gap about this email puts his independence in doubt. In a February 9, 2022 declaration, Ebel said that the "SLC matter" in his March 6, 2020 email could refer to difficulties in scheduling interviews or

the SLC expanded, given the time it would take to bring a new member up to speed and the looming end of the litigation stay on June 1.[173]

The SLC continued to mull a potential expansion. At a March 16 SLC meeting, Ebel told the SLC's counsel that any additions to the Board were unlikely to occur until May 2020.[174] He "also noted the potential difficulties in getting a new SLC member up to speed."[175] Ten days later, Baker Hughes sent stockholders the proxy for its upcoming annual meeting, soliciting votes on the election of two new directors.[176]

---

to the SLC's potential expansion. Unsworn Decl. of Gregory L. Ebel ("Ebel Decl.") (Dkt. 124) ¶ 11(a). Later, during his April 27, 2022 deposition, Ebel testified that the "SLC matter" was the SLC's potential expansion. Ebel Dep. 104. His testimony during the December 19, 2022 hearing was consistent with that given at his deposition. Oral Arg. Tr. 24-25. Ebel also explained that "[h]aving reviewed various communications [since the declaration], [he] felt more comfortable being definitive" during his deposition and at the hearing. *Id.* at 29.

In this context, Ebel's inability to remember with absolute certainty the context of an email sent years earlier is hardly a material fact. Independence is not a memory test. *Cf. In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, 2005 WL 1653923, at *10 (Del. Ch. June 30, 2005) (concluding that a director's "inability to recall important facts" created an issue of material fact about his independence where the director did not recall working for a company affiliated with conflicted directors or attending board meetings for that affiliate). In any event, Ebel has consistently maintained that he did not discuss the substantive details of the SLC investigation with Simonelli—or anyone else aside from his advisors. *See* Ebel Decl. ¶ 12; Ebel Dep. 105, 109; Oral Arg. Tr. 35.

[173] Oral Arg. Tr. 24-25; *see also id.* at 32-33.

[174] SLC's Reply Br. Ex. C at 2.

[175] *Id.*

[176] Baker Hughes Company, Proxy Statement (Schedule 14A) (Mar. 26, 2020).

Ebel reached out to Simonelli again on April 19, 2020, asking "to speak with [Simonelli] th[at] week about the special litigation committee."[177] Ebel wrote: "All good just some delays (for obvious reasons) and, as such, lawyers are wondering about whether we should revisit membership given b[oa]rd changes."[178] Simonelli replied, "let me know when convenient to connect on the SLC."[179] The two subsequently had a brief conversation.[180]

This email was a follow-up to Ebel and Simonelli's prior exchange.[181] Ebel was concerned about "how long [new Board members] would take to get up to speed" given the time needed to complete the SLC's investigation.[182] Just a few days earlier, at an April 13 meeting, the SLC and its counsel had discussed the need for "an extension of at least three months" to complete their process.[183]

---

[177] Pls.' Answering Br. Ex. 92 at -070.

[178] *Id.*

[179] *Id.* at -069.

[180] *See* Ebel Dep. 104-05; *see also* Oral Arg. Tr. 26-27, 31-32.

[181] *See* Ebel Dep. 109.

[182] Oral Arg. Tr. 32.

[183] The Special Litigation Committee's Opp'n to Pls.' Jan. 12, 2022 Mot. to Compel (Dkt. 124) Ex. O at 2. At the next SLC meeting on April 27, 2020, the SLC decided to ask the plaintiffs' counsel to agree to a four-month extension to the stay.

Baker Hughes's stockholders subsequently elected two new directors at the May 14 annual meeting.[184] On May 20, the court granted a stipulated order to extend the stay of the Action until October 1.[185]

The next day, on May 21, Simonelli texted Ebel "let me know when you have a few minutes to connect on [the] SLC."[186] Ebel responded that he could speak that evening or the next.[187] Ebel could not recall the details of this communication during the litigation, but he believed that it "may have been in connection with a potential expansion of the SLC."[188] Given the context, Ebel's explanation is both logical and credible. It was not "strange" that Simonelli reached out because Simonelli knew from prior exchanges that Ebel was interested in the logistics of the Board expansion.[189]

---

[184] Baker Hughes Company, Current Report (Form 8-K) (May 14, 2020) at Item 5.07.

[185] Dkt. 83.

[186] Pls.' Answering Br. Ex. 93 at -056.

[187] Pls.' Answering Br. Ex. 94 at -057.

[188] Ebel Dep. 111; *see* Oral Arg. Tr. 34-35, 60. When Ebel submitted a declaration on February 9, 2022, he could "not recall what Mr. Simonelli wanted to discuss," though he noted that the May 21, 2020 text was sent just after the company's annual meeting. Ebel Decl. ¶ 11(d). He remained uncertain at his April 27, 2022 deposition. Ebel's inability to recall with precision a communication occurring more than two years earlier does not impugn his independence. *See supra* note 172.

[189] Oral Arg. Tr. 59; *see also id.* at 34-35.

The SLC ultimately did not add another member.[190] By this point, the SLC's investigation was well underway, and the time left to complete its work grew short.[191] The SLC felt that adding another member would cause delay, especially given the logistical difficulties created by the COVID-19 pandemic.[192]

### ii. *The Lockdown Interview Update*

On April 8, 2020, Ebel emailed Simonelli to discuss predicted European demand for liquified natural gas amid the COVID-19 pandemic.[193] Simonelli replied, offering his thoughts on the subject.[194] Ebel then sent a three-paragraph response to Simonelli.[195] The first paragraph of that response addressed industry predictions. The second paragraph addressed Baker Hughes public disclosures about the pandemic. The third paragraph stated:

> Also had a good interview today with [Baker Hughes Managing Director] Marco Forgione in Florence[, Italy] on the special litigation front. Good outcome despite taking 3 hours. You can tell thing are getting old with the lockdown [t]here.[196]

---

[190] *See id.* at 35; Ebel Decl. ¶ 10.

[191] By May 20, 2020, the SLC had completed ten interviews. *See* SLC Rep. App. C.

[192] *See* Oral Arg. Tr. 35.

[193] Pls.' Answering Br. Ex. 91 at -068.

[194] *Id.* at -067.

[195] *Id.*

[196] *Id.*

Ebel's description of a "[g]ood outcome" did not refer to the substance of Forgione's interview or the SLC's investigation. Rather, Ebel credibly testified that it referred to the interview having been completed despite the COVID-19 lockdown in Italy.[197] His testimony is corroborated by the documentary evidence. Ebel's reply itself was part of a chain about Baker Hughes's pandemic response. Further, the Forgione interview memorandum notes that the interview was beset by a spotty internet connection.[198]

The April 8 email does not—as the plaintiffs suggest—show that Simonelli and Ebel are friends or that they "regularly" communicated about the SLC's investigation.[199] Undoubtedly, Ebel had no reason to tell Simonelli about the quality of the SLC's interview.[200] But the email was non-substantive and innocuous. It does not raise a meaningful question about Ebel's independence from Simonelli.

---

[197] Oral Arg. Tr. 37-38; *see also* Ebel Decl. ¶ 11(b); Ebel Dep. 106-08. Around this time, Italy announced a nationwide lockdown due to the pandemic. *See* Allison McCann, Nadja Popovich, & Jin Wu, *Italy's Virus Shutdown Came Too Late. What Happens Now?*, N.Y. Times (Apr. 5, 2020).

[198] Forgione Interview Mem. 1 n.2.

[199] Pls.' Answering Br. 52-53.

[200] *See* Oral Arg. Tr. 56.

### iii. *"Thanks for the Wine"*

On June 30, 2020, Ebel texted Simonelli:

> Excellent discussion I thought. Seems like a really good choice. I am on an slc video interview for next 3 hours with Geoff Beattie and a bunch of lawyers (lucky me). Perhaps we can chat later in day quickly. Say 4:30. If not perhaps tomorrow. Thanks for the wine btw![201]

Ebel testified that the first two sentences referred to recruiting a new executive.[202] A further discussion about the potential hire would be delayed because of the SLC interview.

The plaintiffs appear to accept this premise but say that the text raises two concerns. First, they argue that the text suggests Ebel failed to investigate with "full vigor."[203] This contention is belied by the record. Ebel participated in most of the SLC interviews, which he prepared for alongside his counsel.[204] He oversaw the investigation, reviewed documents gathered by counsel, and routinely met with his

---

[201] Pls.' Answering Br. Ex. 95 at -063.

[202] Oral Arg. Tr. 39, 61; *see also* Ebel Decl. ¶ 11(e); Ebel Dep. 113.

[203] Pls.' Answering Br. 55 (quoting *Oracle II*, 824 A.2d at 941 (noting the "dangers posed by investigators who harbor reasons not to pursue the investigation's targets with full vigor")).

[204] *See* SLC Rep. App. C. Scheduling conflicts prevented Ebel from attending two of the twenty-two interviews. *Id.* at 181; *see Alpha Venture Cap. P'rs. v. Pourhassan*, C.A. No. 2020-0307-PAF, at 27-28 (Del. Ch. Apr. 19, 2021) (TRANSCRIPT) (citing directors' attendance at interviews as demonstrating engagement); *Kikis v. McRoberts*, C.A. No. 9654-CB, at 93 (Del. Ch. May 19, 2016) (TRANSCRIPT) (same). By the time of the June 30 text, the SLC had completed twelve interviews. *See* SLC Rep. App. C.

advisors.[205]  Ebel understood that "[he] had a task to do and did it."[206]  He was simply not thrilled about spending three more hours with a "bunch of lawyers."[207]

Second, the plaintiffs aver that Simonelli's gift of wine creates "a clear material fact issue as to whether that friendly relationship 'would be on the mind of [Ebel] in a way that generates an unfair risk of bias.'"[208]  But it was not as though Ebel were singled out.  Simonelli had organized virtual "social events" for the full Board during the pandemic and sent wine to each director to share together over video.[209]  "[I]t would be a strained and artificial rule requiring a director to be unacquainted or uninvolved with fellow directors in order to be regarded as independent."[210]

---

[205] *See infra* note 232 and accompanying text.

[206] Ebel Dep. 113.

[207] *Id.*; *see* Oral Arg. Tr. 39 ("[Q.]  What were you communicating there?  A. [Ebel]. Nothing other than it was -- there were a lot of interviews in going through that, and it was just not a choice event.  I would just say it was long, drawn-out things over Zoom and Teams, et cetera.").

[208] Pls.' Answering Br. 56 (quoting *Oracle II*, 824 A.2d at 947).

[209] Oral Arg Tr. 40; *see also* Ebel Dep. 113-14.  If anything, it would have been strange for Simonelli to exclude Ebel from the Board social event.

[210] *Diep*, 280 A.3d at 152 (quoting *Sutherland v. Sutherland*, 958 A.2d 235, 241 (Del. Ch. 2008) [hereinafter "*Sutherland II*"]).

### b. Ebel's Relationship with Cazalot

Next, the plaintiffs aver that connections to Cazalot undercut Ebel's independence. Cazalot and Ebel served together on another board from 2013 until 2019.[211] Cazalot recommended Ebel as one of several possible Board candidates with industry experience who could replace Craighead.[212]

Cazalot was not, however, a defendant in the Action during the SLC investigation.[213] The plaintiffs assert that Cazalot remained interested because he hypothetically could have become a defendant again.[214] But he never did. Even if Cazalot were a defendant, his overlapping board service with and recommendation of Ebel would not raise a genuine issue of fact about Ebel's independence.[215]

---

[211] In November 2013, Cazalot joined the board of Spectra Energy Corp., while Ebel served as Spectra's Chairman, CEO, and President. In 2018, Spectra merged with Enbridge, Inc., and both Cazalot and Ebel joined the Enbridge board—with Ebel becoming the Chairman. Cazalot left the Enbridge board in 2019. *See* SLC Rep. 171-73; Oral Arg. Tr. 8-9.

[212] Pls.' Answering Br. Ex. 77 at 18-20.

[213] *See* Dkt. 29.

[214] Pls.' Answering Br. 56-57.

[215] *See Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1997 WL 305829, at *11 (Del. Ch. May 30, 1997) (rejecting the plaintiffs' challenge to an SLC member's independence based on the manner in which he was recommended for board service); *see also Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (holding in the demand futility context that directors were independent despite having "served together" with an interested director "on a few boards of unaffiliated companies"); *McElrath v. Kalanick*, 224 A.3d 982, 995 (Del. 2020) (explaining in the demand futility context that "being nominated or elected by a director who controls the outcome is insufficient by itself to reasonably doubt a director's independence because that is the usual way a person becomes a corporate director" (internal quotation marks omitted)); *In re MFW S'holders Litig.*, 67

c.     The SLC's Counsel

Finally, the plaintiffs argue that the SLC's counsel lack independence. The only basis for that assertion is that other Quinn Emmanuel and Abrams & Bayliss attorneys uninvolved with the SLC investigation previously represented GE.[216] The SLC's counsel repeatedly stated that none of the attorneys working on the SLC engagement had represented GE.[217] The SLC's counsel also represented that they were willing to sue GE.[218] In fact, both Quinn Emmanuel and Abrams & Bayliss have done so in the past.[219] There is no indication that the SLC's counsel were biased or acted with impropriety during the investigation.[220]

---

A.3d 496, 511 (Del. Ch. 2013) (observing that "allegations of friendliness," including that a director asked a special committee member to serve on the board, were "exactly of the immaterial and insubstantial kind our Supreme Court held were not material in *Beam v. Stewart*"), *aff'd sub nom. Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014); *supra* note 161.

[216] Pls.' Answering Br. Exs. 96-105.

[217] *See* SLC's Reply Br. 14-15; SLC Rep. 174; Oral Arg. Tr. 14.

[218] Oral Arg. Tr. 106.

[219] *See, e.g.*, *Monument Peak Ventures, LLC v. GE Healthcare, Inc.*, No. 18-CV-1158 JLS (S.D. Cal.); *Gen. Elec. Co. v. Monument Peak Ventures, LLC*, No. IPR2019-00993 (P.T.A.B.); *Wind Point P'rs VII-A, L.P. v. Insight Equity A.P. X Co., LLC*, C.A. No. N19C-08-260 EMD CCLD (Del. Super.).

[220] *See Kaplan*, 499 A.2d at 1190 (rejecting an argument that a special litigation committee did not act in good faith where the committee's legal advisors were named defendants in another action brought by the plaintiff's counsel and contributed to the $50 million settlement of that action).

43

2.     The SLC Conducted a Thorough Investigation in Good Faith.

The SLC also bears the burden of proving that it "acted in good faith and conducted a thorough investigation."[221] A good faith investigation is one that is pursued in an unbiased manner and without a predetermined conclusion.[222] "[T]he SLC must investigate all theories of recovery asserted in the . . . complaint" by "explor[ing] all relevant facts and sources of information that bear on the central allegations."[223]

The SLC and its advisors spent more than 6,300 hours on the investigation.[224] The SLC began its process by meeting with the plaintiffs' counsel to understand the plaintiffs' theories of the Action.[225] The SLC then engaged in extensive fact gathering, which involved reviewing more than 110,000 documents and interviewing 22 witnesses.[226] The SLC investigated not only the claims and

---

[221] *Kindt II*, 2003 WL 21453879, at *3 (Del. Ch. May 30, 2003); *Diep*, 280 A.3d at 155 (explaining that the court must consider "whether disputed issues of material fact were raised about the scope of the investigation").

[222] *See Biondi v. Scrushy*, 820 A.2d 1148, 1156 (Del. Ch. 2003), *aff'd sub nom. In re HealthSouth Corp. S'holders Litig.*, 847 A.2d 1121 (Del. 2004); *London*, 2010 WL 877528, at *15.

[223] *London*, 2010 WL 877528, at *17.

[224] SLC Rep. 2.

[225] *Id.* at 184-85; *see id.* Ex. 216.

[226] *See infra* note 281 (describing the topics and sources of information collected and reviewed). The interviewees included: (1) Simonelli; (2) Worrell; (3) current and former Baker Hughes directors, including the members of the Conflicts Committee; (4) Baker

44

allegations in the Complaint but also issues not raised by the plaintiffs.[227]  There is

no evidence indicating that the SLC worked toward a predetermined conclusion.[228]

---

Hughes employees involved in negotiating the 2018 Transactions; (5) GE CFO Miller; (6) a senior GE in-house attorney who was involved in negotiating the 2018 Transactions; (7) a senior GE employee who was involved in negotiating amendments to the Master Agreement Framework on behalf of GE Aviation; (8) representatives of the financial advisors for Baker Hughes, the Conflicts Committee, and GE; and (9) a representative of Baker Hughes's outside counsel for the 2018 Transactions.  SLC Rep. 181-83.  The SLC determined that the witnesses appeared credible and (with one exception) were forthcoming.  Mulva, GE designee to the Board, declined to answer any questions relating to his role as a GE board member or GE's internal deliberations about its negotiating positions.  He responded to all other questions.  *Id.*

[227] For example, the Complaint lacks any allegations about the Conflicts Committee's process.  Yet the SLC investigated whether GE attempted to undermine it.  SLC Rep. 218-21.  The SLC also examined potential weaknesses in the process leading to the 2018 Transactions that were not addressed in the Complaint.  *Id.* at 237-52.  Similarly, the SLC investigated Simonelli's actions as a Baker Hughes officer, even though the Complaint did not advance a claim against Simonelli in that capacity.  *Id.* at 303-05.  *See Kindt II*, 2003 WL 21453879, at *4 (concluding that an SLC acted in good faith because, among other things, the "SLC also rooted out additional facts not even alleged by plaintiff"); *cf. Sutherland II*, 958 A.2d 242-44 (holding that an SLC failed to demonstrate its good faith where it did not address a central transaction, produced interview summaries with limited information, and reviewed evidence in a cursory manner).

[228] *See* Oral Arg. Tr. 11-12; Ebel Dep. 25-26, 123-24; *see also Katell*, 1995 WL 376952, at *9 (rejecting the plaintiffs' assertion that an SLC "sought to uncover as little evidence as possible, and then reach the predetermined conclusion to dismiss the lawsuit"); *Kaplan*, 484 A.2d at 514-15, 519 (rejecting the plaintiffs' challenge to an SLC's good faith based on the purported animosity the SLC's counsel had toward the plaintiff's counsel and the failure to investigate key issues).  The plaintiffs suggest that the SLC prejudged the outcome of its investigation because it began drafting the report before the SLC met with Brattle or reached formal conclusions.  Pls.' Answering Br. 73.  But the SLC's counsel had only prepared a draft fact section of the report, which was provided to Ebel before the SLC's September 22, 2020 meeting.  *See* Ebel Dep. 118-19, 152-53; Hutchings Dep. 128; Smith Dep. 172; SLC's Reply Br. Ex. E at 1.  This is neither unusual nor inappropriate given the time and effort required to prepare a thorough report and the "static" factual narrative.  *See* Oral Arg. Tr. 107.  The SLC's preliminary draft did not contain any conclusions or recommendations; it summarized the facts found by the SLC.  *See* SLC's

45

Its work resulted in a 320-page report that cites to 242 exhibits and 22 witness interview memoranda.

Nonetheless, the plaintiffs contend that the SLC cannot meet its burden for several reasons. They assert that the SLC hid behind privilege, that the SLC did not adequately investigate advisor conflicts, and that certain information sources were overlooked.[229] None of these issues raise material questions of facts about whether the SLC's investigation was reasonable in scope and conducted in good faith.

### a. The Cloak of Privilege

According to the plaintiffs, the SLC "chose to cloak the investigation in privilege and shield information necessary for an adequate evaluation of the investigation."[230] First, the plaintiffs complain that the SLC's counsel—not Ebel— led the investigation. There is, however, no legitimate issue of fact that would lead me to "second guess the SLC's decisions regarding the role which counsel

---

Reply Br. Ex. E at 1; Ebel Dep. 123-24. The SLC did not decide whether to terminate the Action until its September 24, 2020 meeting. *See* Pls.' Answering Br. Ex. 88 (SLC meeting minutes); Ebel Dep. 123-24.

[229] Certain arguments raised by the plaintiffs about the SLC's process restate those made about the SLC's independence. The plaintiffs again aver that Ebel lacked "enthusiasm" and that Ebel's communications with Simonelli put the SLC's good faith in doubt. These arguments fail for the reasons discussed above. *See supra* notes 203-07 and accompanying text.

[230] Pls.' Answering Br. 60-61.

played."[231]    The SLC report, SLC meeting minutes, and Ebel's testimony demonstrate his active oversight of counsel and the investigation.[232]    The SLC's reliance on experienced advisors "is not only allowed but is 'evidence [of] good faith and the overall fairness of the process.'"[233]

Relatedly, the plaintiffs find fault with the SLC's counsel serving as an intermediary between Ebel and Brattle, which they characterize as forgoing "education" for "insulation."[234]    Brattle's model evaluating the economic terms of the 2018 Transactions, for example, was not provided to Ebel or included in the SLC report.    But Ebel was not required to independently review Brattle's model or its

---

[231] *Carlton*, 1997 WL 305829, at *12.    The plaintiffs imply that the SLC's counsel interacted with Baker Hughes's counsel at Davis Polk too frequently.    *See* Pls.' Answering Br. 38-39.    But the SLC's counsel communicated with Davis Polk only to obtain document discovery, to set up interviews, and for other administrative issues.    *See* SLC Rep. 184; *see also Kaplan*, 484 A.2d at 513, 519 (rejecting attacks to a special litigation committee's process based on the involvement of the nominal defendants' counsel).    Ebel testified that Davis Polk played no role in the substance of the SLC's investigation.    Oral Arg. Tr. 68.

[232] *See* SLC Rep. 176; Oral Arg. Tr. 15-20; Ebel Dep. 11-13, 37-39, 47-49, 72-75, 121-23. Although the SLC's counsel was primarily responsible for writing the report, Ebel directed the drafting process and reviewed the report before approving it.    Ebel Dep. 93, 155, 213-14; *see* SLC's Reply Br. Ex. E at 1.

[233] *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *23 n.67 (Del. Ch. May 22, 2000) (quoting *Cinerama Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1142 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995)); *see Carlton*, 1997 WL 305829, at *12 ("While the directors bear ultimate responsibility for making informed judgments, good faith reliance by a SLC on independent, competent counsel to assist the SLC in investigating claims is legally acceptable, practical, and often necessary.").

[234] Pls.' Answering Br. 62-63, 70-71; *see also* Oral Arg. Tr. 140-41.

internal communications.[235]  He periodically received updates from counsel about Brattle's progress and met with Brattle before reaching his conclusions.[236]  This approach was reasonable and consistent with the SLC's good faith reliance on its advisors.[237]

Next, the plaintiffs say that certain documents, including drafts of the SLC report and materials prepared by Brattle, were withheld from them.  The SLC opted not to assert privilege against the plaintiffs.  It relied on work product protection for a limited set of documents.[238]

In any event, the plaintiffs' desired documents fall outside the limits of *Zapata* discovery.[239]  The discovery the plaintiffs obtained—12,190 pages of documents and

---

[235] *See Kikis*, C.A. No. 9654-CB, at 59, 67-68, 110 (rejecting an argument that an SLC had to analyze purported comparables underlying expert's conclusions).  Brattle's work for the SLC was consistent with Brattle's regular practice of coordinating with counsel before providing information to the ultimate client.  *See* Smith Dep. 79-80; Hutchings Dep. 84.

[236] *See* Oral Arg. Tr. 19; Ebel Dep. 121-23; SLC's Reply Br. Exs. D-F.  Ebel directly interacted with Brattle at a September 22, 2020 SLC meeting.  During this meeting, Brattle presented its analyses of the 2018 Transactions and Ebel asked Brattle questions.  *See* Pls.' Answering Br. Ex. 109 at 1-3; *see also* Ebel Dep. 128-51; Smith Dep. 188-89, 198-200; Hutchings Dep. 183-89.

[237] *See supra* note 233 and accompanying text.

[238] The SLC produced meeting minutes to the plaintiffs without work product redactions. *See* Dkt. 132.  It also chose to produce its interview memoranda rather than assert work product protection.  *See In re Oracle Corp. Deriv. Litig.*, 2020 WL 3867407, at *6 (Del. Ch. July 9, 2020) [hereinafter "*Oracle NetSuite*"] ("The contents of the Interview Memoranda . . . easily fit within the recognized bounds of work product.").

[239] Earlier, the plaintiffs filed a motion to compel documents between the SLC's counsel and anyone other than the SLC, its counsel, or its financial expert about the SLC process.

depositions of Ebel and two Brattle representatives—was sufficient to explore the adequacy of the SLC's investigation.[240] *Zapata* discovery "must be limited in scope . . . and focused in light of its purpose, *i.e.*, verification of the independence and good faith of the committee."[241] The plaintiffs were not entitled to a fishing expedition or the sort of broad discovery available in a plenary dispute.[242]

### b.     The Adequacy of the Investigation

The plaintiffs next argue that the SLC performed an inadequate and selective investigation into their entire fairness claims. In particular, the plaintiffs focus on whether the SLC addressed the independence of the 2018 Transactions advisors. More generally, they aver that the SLC's process excluded certain sources of information.

---

I denied this motion because the SLC had already produced sufficient information about the investigation. There was "no need for the plaintiffs to sift through the granularities of every discovery decision made by the SLC and its counsel." MTC Ruling 53-54. Delaware courts have declined to compel the production of the sort of documents the plaintiffs complain were withheld from them. *See*, *e.g.*, *Oracle NetSuite*, 2020 WL 3867407, at *8-9; *Kindt I*, 2001 WL 1671438, at *2; *Sutherland I*, 2007 WL 1954444, at *4; *Primedia*, C.A. No. 1808-VCL, at 53; *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Servs. of Cincinnati, Inc.*, 1995 WL 347799, at *3 (Del. Ch. May 17, 1995); *Rohm & Haas Co. v. Dow Chem. Co.*, 2009 WL 537195, at *2 (Del. Ch. Feb. 26, 2009).

[240] *See* MTC Ruling 53-54; *supra* notes 125-26 and accompanying text.

[241] *Kindt v. Lund*, 2001 WL 1671438, at *1 (Del. Ch. Dec. 14, 2001) [hereinafter "*Kindt I*"]; *see* MTC Ruling 55-56.

[242] *See Sutherland I*, 2007 WL 1954444, at *3.

49

i.    *Advisor Conflicts*

Certain advisors to the 2018 Transactions—J.P. Morgan and Davis Polk for Baker Hughes, and Lazard for the Conflicts Committee—had represented GE and its affiliates on other transactions.[243] The SLC report highlights that the Conflicts Committee had "Access To Independent And Knowledgeable Advisors" but does not address the advisors' relationships with GE.[244] The plaintiffs argue that this omission raises a genuine question of material fact about the thoroughness of the SLC's investigation. Although the SLC report does not explicitly address the transaction advisors' independence, the SLC has shown that it reasonably investigated these potential conflicts in good faith.

---

[243] *See, e.g.*, *In re Dollar Thrifty S'holders Litig.*, 14 A.3d 573, 582 (Del. Ch. 2010) (explaining that an investment banker having a business relationship with a counterparty "is evidence of one of the facts of business life—that most of the top, if not all, banks have relationships with the major private equity firms"); *see also* Pls.' Answering Br. Ex. 84 ("Jannis Interview Mem.") at 8 (Baker Hughes Head of Business Development explaining he believed "GE was probably working with every major law firm in New York City in some way").

[244] SLC Rep. 216-17; *see also id.* at 191, 211; Oral Arg. Tr. 68, 74-75.

J.P. Morgan.  J.P. Morgan served as Baker Hughes's financial advisor for the 2018 Transactions.[245]  It did not represent the Conflicts Committee.[246]  The plaintiffs argue that the SLC overlooked the length and scope of J.P. Morgan's relationship with GE.  In particular, the plaintiffs say the SLC did not consider certain documents reflecting the amount of work J.P. Morgan performed for or the fees J.P. Morgan received from GE.[247]  But the SLC demonstrated that it appropriately evaluated this matter.[248]

---

[245] J.P. Morgan principally advised Baker Hughes on the Capital Markets Transactions. Oral Arg. Tr. 75, 112.  J.P. Morgan did not "engag[e] directly in negotiations" over the amendments to the Master Agreement Framework.  Pls.' Answering Br. Ex. 107 at 4 ("Weir Interview Mem.") (summarizing the interview of the J.P. Morgan Managing Director who led the team advising Baker Hughes in the 2018 Transactions); *see* SLC Rep. 130-32.  Rather, J.P. Morgan performed valuation analyses on the terms of the amendments.  *See* Weir Interview Mem. 3-4; SLC Rep. 106-08 & figs. 13-14.

[246] SLC Rep. 216-17; *see also* Pls.' Answering Br. Ex. 17 ("Brenneman Interview Mem.") at 10; Pls.' Answering Br. Ex. 37 ("Scott Interview Mem.") at 4-5 (summarizing the interview of the Lazard Director who advised the Conflicts Committee in the 2018 Transactions).

[247] Pls.' Answering Br. Exs. 20-22.

[248] Ebel testified at his deposition that "the SLC [did nothing] to vet JP Morgan's independence in connection with its investigation of the 2018 [Transactions]."  Ebel Dep. 183.  When testifying before the court, he stated that "[the SLC] asked [the advisors] what process they had followed, you know, had the advisors had a process in particular [regarding conflicts]."  Oral Arg. Tr. 48.  He "remember[ed the SLC] had the J.P. Morgan folks walk through what their process was to make sure there weren't conflicts."  *Id.*  This testimony is corroborated by the documentary evidence showing that the SLC inquired into this potential conflict.  *See infra* notes 249-52 and accompanying text.

The SLC reviewed thousands of documents produced by J.P. Morgan.[249]  It asked interviewees about J.P. Morgan's potential conflicts and interactions with the Conflicts Committee.[250]  A J.P. Morgan Managing Director told the SLC that J.P. Morgan has a "strict and rigorous conflicts process" and confirmed that no member of the J.P. Morgan team represented GE while working on Project SAW.[251]  A representative of Baker Hughes management also told the SLC that he had "no concerns" about J.P. Morgan's work or loyalties.[252]  The SLC's failure to focus on specific documents the plaintiffs would have highlighted does not invalidate the SLC's investigation.[253]

_____

[249] SLC Rep. 177-78; *see* Oral Arg. Tr. 109.

[250] *See* Weir Interview Mem. 3; Jannis Interview Mem. 7; Pls.' Answering Br. Ex. 108 ("Harbour Interview Mem.") at 3-4 (summarizing the interview of the Lazard Managing Director who advised Baker Hughes in the 2018 Transactions).

[251] Weir Interview Mem. 3.

[252] Jannis Interview Mem. 7; *id.* Ex. 5 at -719.  The SLC identified a December 2017 email from J.P. Morgan to the interviewee stating that J.P. Morgan's work for Baker Hughes did not prevent another J.P. Morgan team from "pursuing other related opportunities within GE." *Id.* Ex. 5 at -719.  The interviewee told the SLC that he was aware that J.P. Morgan was not prevented from seeking work from GE in separate matters. *Id.* at 7.

[253] *See Carlton*, 1997 WL 305829, at *19 ("While in an ideal world the SLC would have been aware of this document prior to the settlement, it is understandable that a document of potential relevance could have been overlooked or misplaced in an investigation involving the magnitude of documents produced in this action. . . .  This alone does not suggest that the SLC failed to perform an adequate investigation or acted in bad faith.").

Davis Polk.  Baker Hughes retained its "long-time attorneys at Davis Polk" for Project SAW.[254]  While advising Baker Hughes on the 2018 Transactions, Davis Polk separately advised GE on other matters.[255]  In July 2018—months before the 2018 Transactions were finalized—a GE representative told a Baker Hughes executive that Davis Polk "ha[d] been doing an enormous amount of work for GE" and could not be expected "to be adverse to GE."[256]  The Conflicts Committee subsequently charged Simpson Thacher with "taking the lead in negotiations with GE."[257]

The record demonstrates that the SLC meaningfully examined Davis Polk's potential conflict.  The SLC interviewed Davis Polk's lead attorney on the engagement and asked him whether Davis Polk was conflicted with respect to Project SAW.[258]  He told the SLC that "Davis Polk did not believe it had an actual conflict" but that Davis Polk had "recommended that the Conflicts Committee retain independent counsel to avoid even the appearance of a potential conflict."[259]  The

---

[254] Brenneman Interview Mem. 5.

[255] Pls.' Answering Br. Exs. 23-25.

[256] Pls.' Answering Br. Ex. 26 at -066.

[257] Pls.' Answering Br. Ex. 27 at -317.

[258] Pls.' Answering Br. Ex. 79 (Bason Interview Mem.) at 6.

[259] *Id.*

SLC also asked Baker Hughes's Head of Business Development about the company's retention of Davis Polk. This executive told the SLC that he "was not concerned that Davis Polk's work for GE might have affected its work for [Baker Hughes]."[260] The SLC further explored the role Simpson Thacher played as the Conflicts Committee's independent legal advisor.[261]

The plaintiffs also assert that Davis Polk's purported conflicts infected the SLC itself because Davis Polk advised the Board on the SLC's formation and engaged with the SLC during its investigation.[262] This hardly impugns the good faith of the SLC's process. An independent SLC, represented by independent counsel, was formed to remove the taint of any Board-level conflicts.[263] Beyond that, Davis Polk's "interact[ion]" with the SLC "to identify key participants in the relevant transactions, coordinate interviews, and follow up on information requested during interviews" was appropriately aimed at gathering information.[264] Ebel's

---

[260] Jannis Interview Mem. 8-9; *see also* SLC's Reply Br. Ex. H (Craighead Interview Mem.) at 5-6 n.7.

[261] *See* SLC Rep. 214 (noting that the Conflicts Committee held executive sessions with only its advisors and without Davis Polk); Scott Interview Mem. 4; *see also* Brenneman Interview Mem. 10; Harbour Interview Mem. 4.

[262] *See* Dkts. 34, 45, 66; Pls.' Answering Br. Ex. 77 at 25-26.

[263] *See Zapata*, 430 A.2d at 786 (explaining that "the board, tainted by the self-interest of a majority of its members, can legally delegate its authority to a committee of two disinterested directors").

[264] SLC Rep. 184; *supra* note 231.

testimony confirmed that Davis Polk did not assist the SLC in the substance of the investigation.[265]

Lazard.  Lazard advised the Conflicts Committee on the 2018 Transactions.[266] The plaintiffs assert that the SLC neglected to assess whether Lazard's work for GE before and concurrently with the 2018 Transactions created a conflict.[267]  The SLC has, however, demonstrated that it adequately investigated Lazard's independence.

The SLC questioned Baker Hughes management and each member of the Conflicts Committee about the retention of Lazard.[268]  None of the interviewees identified issues with Lazard's role.[269]  Conflicts Committee member Cazalot, for example, told the SLC that he "had no concerns" that Lazard was not providing

---

[265] Oral Arg. Tr. 68.

[266] Like J.P. Morgan, Lazard was "not directly involved in the commercial negotiations" over the amendments to the Master Agreement Framework.  Harbor Interview Mem. 3; *see also* Scott Interview Mem. 3-4 (stating that "she did not know of any Lazard bankers directly negotiating with GE or its advisors").  Lazard primarily advised Baker Hughes on the Capital Markets Transactions and worked on valuing the financial effects of the amendments to the Master Agreement Framework.  *See* Oral Arg. Tr. 75, 112; SLC Rep. 140-42.

[267] Pls.' Answering Br. Exs. 38-39; *see* Scott Interview Mem. 2.

[268] Pls.' Answering Br. Ex. 11 ("Cazalot Interview Mem.") at 6; Jannis Interview Mem. 7-8; Brenneman Interview Mem. 5-6; Pls.' Answering Br. Ex. 18 ("Elsenhans Interview Mem.") at 5.

[269] Cazalot Interview Mem. 10 n.11; Jannis Interview Mem. 8; *see also* Brenneman Interview Mem. 5-6; Elsenhans Interview Mem. 5

"independent advice."[270] The SLC also interviewed two Lazard representatives about Lazard's work for GE and neither was aware of any conflicts on their teams.[271]

\* \* \*

Although the SLC report's silence on the independence of J.P. Morgan, Davis Polk, and Lazard is unfortunate, it is not fatal.[272] The SLC has shown that it uncovered relevant documents and inquired into whether the 2018 Transactions advisors were conflicted. The SLC's counsel represented to the court that the report did not address the purported conflicts because "[the SLC] did not identify [them] as a weakness in the process."[273] There is no issue of material fact putting in doubt the SLC's good faith investigation of these issues.

A comparison to *Sutherland v. Sutherland* is instructive.[274] There, a special litigation committee's report lacked any mention of suspicious payments, even

---

[270] Cazalot Interview Mem. 10 n.11.

[271] Scott Interview Mem. 2 (stating that Scott told the SLC that she "was not involved in any representations of GE or its affiliates" after "a minor role" in a 2014 GE transaction); Harbour Interview Mem. 2 (stating that Harbour told the SLC that he "was not aware of Lazard's prior relationships, if any, with GE").

[272] Notably, the SLC report dedicated a full section to weaknesses in the negotiation process of the 2018 Transactions. SLC Rep. 237-53.

[273] Oral Arg. Tr. 111.

[274] *Sutherland II*, 958 A.2d at 235; *see also Sutherland v. Sutherland*, 968 A.2d 1027, 1030 (Del. Ch. 2008) [hereinafter "*Sutherland III*"] (denying a motion for reargument of the *Sutherland I* decision).

56

though "they represented the very sort of suspected activity that motivated [the plaintiff] to file the complaint and were the largest identified payments by the companies to any of the individual defendants."[275]   The SLC omitted this problematic information while "includ[ing] exculpatory information of a similar character."[276]   The plaintiff only learned about the payments after she "won a hard-fought motion to compel."[277]   The court concluded that this seemingly intentional omission, which went "to the very heart" of the complaint, cast doubt on whether the single-member committee had conducted a good faith investigation.[278]

Here, by contrast, there is no reason to suspect that the SLC concealed evidence.   The SLC report details flaws in the transaction process.   The SLC voluntarily produced documents discussing its investigation into potential conflicts.

Even if the plaintiffs were right that the SLC's assessment of these issues was inadequate, the outcome of the present motion would not change.  The independence of the negotiating parties' advisors would be a single factor in the holistic analysis of whether the 2018 Transactions were entirely fair.[279]  As discussed below, the SLC

---

[275] *Sutherland III*, 968 A.2d at 1030.

[276] *Sutherland II*, 958 A.2d at 243.

[277] *Sutherland III*, 968 A.2d at 1030.

[278] *Id.*; *see Sutherland II*, 958 A.2d at 243.

[279] These purported conflicts were not mentioned in the Complaint or the plaintiffs' December 17, 2019 presentation to the SLC.

concluded—after weighing the process strengths and weaknesses—that the court would likely find the 2018 Transactions resulted from a fair process. The fact that an advisor had done work for GE would not make that conclusion unreasonable.[280]

ii. *Information Sources*

The plaintiffs also critique the SLC's document collection and review efforts. The SLC reviewed documents from numerous sources that covered a range of relevant topics.[281] Despite this, the plaintiffs fault the SLC for not obtaining text messages from any custodian or emails from Mulva, a GE designee to the Board.

---

[280] The financial advisors primarily worked on the Capital Market Transactions, which were "largely at market, where they're not all that reliant on the bankers to get the number right." SLC Rep. 112; *see also id.* at 75; SLC Rep. 273-83. Similarly, the negotiations over the Master Agreement Framework were "the domain of specialized industry experts" rather than lawyers or bankers. Oral Arg. Tr. 113; *see also* SLC Rep. 85-127, 235-36; *see infra* Section II.A.3.a (discussing the presence of reasonable bases for the SLC's conclusions).

[281] These topics included: (1) the original Master Agreement Framework; (2) GE's November 2017 announcement, and Baker Hughes's reaction to that announcement; (3) GE's strategic review of its Baker Hughes stake; (4) Baker Hughes's ordinary course stock repurchase program; (5) Baker Hughes's negotiation preparations, including the analyses Baker Hughes management, J.P. Morgan, and Lazard performed; (6) Baker Hughes's proposals to and negotiations with GE and its subsidiaries related to the 2018 Transactions; (7) GE's negotiation of the 2018 Transactions; (8) the Conflicts Committee's actions in connection with Baker Hughes's ordinary course stock repurchase program and the 2018 Transactions; (9) the Baker Hughes Board's actions in connection with Baker Hughes's ordinary course stock repurchase program and the 2018 Transactions; (10) GE's financial position during November 2017 to November 2018, including market commentary; and (11) the market's reaction to the 2018 Transactions. SLC Rep. 177-78.

The document sources included: (1) Conflicts Committee members; (2) Lazard; (3) Simpson Thacher; (4) current and former Baker Hughes directors; (5) current and former Baker Hughes officers and employees; (6) J.P. Morgan; (7) Davis Polk; (8) current

58

The SLC initially requested text messages from certain custodians but opted not to insist on their production.[282] In reaching that decision, the SLC considered the extensive record available from emails and other electronic documents, and representations that certain custodians did not use text messages for business communications.[283] The SLC weighed the likelihood that substantive text messages existed against the distraction, burden, and delay of collecting data from multiple custodians' personal devices.[284] Given the substantial record that it reviewed, there are no grounds to conclude that the SLC's reasoned choice not to collect text messages creates a genuine dispute about the completeness of its investigation.

The SLC's decision not to collect Mulva's email is similarly inconsequential. Mulva did not produce emails to the SLC because his general practice "going back 30 years" is to delete them soon after receipt.[285] He did not change this practice in response to a litigation hold notice.[286] The SLC considered numerous factors in deciding how to respond, including the availability of documents from other GE

---

and former GE directors, officers, and employees; (9) Morgan Stanley, GE's financial advisor; and (10) Shearman & Sterling LLP, GE's legal advisor. *Id.* at 177.

[282] The SLC collected and produced Ebel's text messages.

[283] *Id.* at 180.

[284] *Id.*

[285] *Id.* at 179.

[286] *Id.*

Board designees and GE's agreement to produce internal communications.[287] This

approach was reasonable.[288]

### 3.    The SLC Reached Reasonable Conclusions.

The third inquiry under *Zapata*'s first step is whether the special litigation

committee had reasonable grounds for its conclusions.[289] "In reviewing the

[committee's] conclusions, the Court does not take an independent look at the merits

of lawsuit."[290] A reasonable conclusion is not necessarily an objectively correct

one.[291] The court also need not assess every subsidiary conclusion made by a special

litigation committee.[292] Instead, the court looks to whether "the result as a whole is

---

[287] *Id.* at 179-80.

[288] *See Kikis*, C.A. No. 9654-CB, at 102-03 (rejecting quibbles with SLC's investigative approach); *Katell*, 1995 WL 376952, at *9 (same); *Kaplan*, 484 A.2d at 515-16 (same); *Carlton*, 1997 WL 305829, at *8 n.38 (addressing the SLC's inability to interview certain potential witnesses); *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *26 n.255 (Del. Ch. May 8, 2015) (concluding that a demand review committee's investigation was reasonable though the committee did not interview current and former CEOs), *aff'd*, 132 A.3d 748 (Del. 2016).

[289] *See Kindt II*, 2003 WL 21453879, at *3 (citing *Zapata*, 430 A.2d at 788).

[290] *Katell*, 1995 WL 376952, at *12; *see also London*, 2010 WL 877528, at *18 (explaining that the court must "avoid considering the merits of plaintiffs' claims").

[291] *See Carlton*, 1997 WL 305829, at *16 (concluding that the SLC's determinations were "one reasonable interpretation of the record" and explaining that "[w]hether they were correct is not in issue at this stage").

[292] *See id.* at *20; *Kikis*, C.A. No. 9654-CB, at 98, 107.

reasonable and the product of independent, informed action of directors acting in good faith."[293]

To meet its burden, a special litigation committee "must show that it correctly understood the law relevant to the case" and reasonably applied the law to the facts.[294] Here, the SLC appropriately identified that entire fairness review would apply to the plaintiffs' claims.[295] The SLC also reasonably determined that the burden of proof would shift to the plaintiffs because of the Conflicts Committee's role in negotiating the 2018 Transactions.[296]

The SLC concluded that process leading to the 2018 Transactions "proceeded fairly and pursuant to a process that simulated arms'-length bargaining."[297] The SLC also concluded that "the economic terms of the 2018 Transactions fell within the

---

[293] *Carlton*, 1997 WL 305829, at *20.

[294] *London*, 2010 WL 877528, at *17; *see also Katell*, 1995 WL 376952, at *12 ("The Special Committee has to demonstrate the reasonableness of the bases of its conclusions with undisputed facts. This requires the Special Committee to show that Plaintiffs do not dispute the existence of information or evidence relied on by the Special Committee, but it does not require the Special Committee to show that the parties do not dispute material facts regarding Plaintiffs' allegations. The Special Committee can use undisputed information to form its own conclusions as to factual disputes concerning Plaintiffs' allegations.").

[295] SLC Rep. 223-25; *see* MTD Ruling 101.

[296] SLC Rep. 221-22; *see* MTD Ruling 102 (noting the possible application of *Kahn*, 638 A.2d at 1117).

[297] SLC Rep. 226; *see id.* at 226-53.

range of fairness."[298]  It determined that "[b]ased on the evidence it reviewed, . . . the 'process' and price' of the 2018 Transactions mutually reenforced the SLC's conclusions . . . that each of [the challenged] transactions likely fell within the range of fairness."[299]  The SLC therefore explained that "Baker Hughes could not reasonably expect to recover meaningful damages or settlement payments from the prosecution of Plaintiffs' claims."[300]  The SLC "determined in the exercise of its business judgment that terminating the [Action] with prejudice would best serve the interests of [Baker Hughes] and its stockholders."[301]

The plaintiffs take a scattershot approach to challenging the reasonableness of these conclusions.[302]  They raise, by my count, at least twelve separate criticisms that largely amount to disagreements with the SLC's analyses.[303]  The first step of *Zapata* is not, however, an opportunity for the plaintiffs to litigate the merits of their

---

[298] *Id.* at 289; *see id.* at 253-89.

[299] *Id.* at 289-90.

[300] *Id.* at 319.

[301] *Id.* at 320.

[302] *See Kaplan*, 484 A.2d at 511 (describing the analytical difficulties presented when plaintiffs "pull out all stops" and "throw every possible argument imaginable into the controversy, no matter how minor or picayune"); *see also Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 882 n.184 (Del. Ch. 2012) ("[I]t is more time-consuming to clean up the pizza thrown at a wall than it is to throw it."), *aff'd*, 59 A.3d 1206 (Del. 2012).

[303] *See Kaplan*, 484 A.2d at 519 ("[I]t is the Special Litigation Committee which is under examination at this first-step stage of the proceedings, and not the merits of the plaintiff's cause of action.").

claims. "[T]he question is not whether there were disputed issues of material fact about the merits-based issues raised" by the plaintiffs.[304] Rather, the relevant inquiry is "whether disputed issues of material fact were raised about . . . the reasonableness of the SLC's conclusions."[305]

### a. Fair Process

The SLC evaluated the strengths and weaknesses of the 2018 Transactions process. Strengths included the leverage Baker Hughes held over GE while the Lockup remained, Baker Hughes's proactive and prepared approach to the negotiations, the Conflicts Committee's assertiveness, and the industry expertise of the Baker Hughes negotiators.[306] Flaws included the negotiators' status as legacy GE employees, the potential disclosure of Baker Hughes confidential information to GE, GE's potential non-disclosure of information to Baker Hughes, and rumors that GE might fire Simonelli.[307] The SLC viewed the process as "imperfect" but concluded that it was fair.[308]

---

[304] *Diep*, 280 A.3d at 155.

[305] *Id.*

[306] SLC Rep. 226-37.

[307] *Id.* at 237-52.

[308] *Id.* at 252-53; *see In re BGC P'rs, Inc. Deriv. Litig.*, 2022 WL 3581641, at *18 (Del. Ch. Aug. 19, 2022) (holding that an "imperfect" process was fair).

The plaintiffs raise multiple objections to this conclusion, most of which ask the court to substitute the plaintiffs' judgment for that of the SLC.[309]  Though it would suffice to say that a debate on the merits is inappropriate under *Zapata*, I briefly consider each of the plaintiffs' arguments for the sake of completeness.[310]  None raises a genuine issue of material fact about the reasonable bases supporting the SLC's conclusion that the process was fair.

Baker Hughes's Negotiating Leverage.  The plaintiffs aver that the SLC unreasonably "concluded that [Baker Hughes] lacked meaningful negotiating leverage over GE."[311]  The SLC, however, found that Baker Hughes *had* leverage.[312]  The SLC report recounts Baker Hughes and the Conflicts Committee's belief that the Lockup gave Baker Hughes the upper hand.[313]  The SLC described this leverage as a "melting ice cube" that would disappear once the Lockup expired in July

---

[309] Pls.' Answering Br. 74-80.  Among other contentions, the plaintiffs make a one-sentence argument that the SLC's conclusion is unreasonable because it "utterly failed to adequately investigate the independence of the advisors on the Transactions." *Id.* at 76. I have already considered and rejected this argument.  *See supra* Section II.A.2.b.i.

[310] *See Kikis*, C.A. No. 9654-CB, at 96-97.

[311] Pls.' Answering Br. 76.

[312] SLC Rep. 81-85, 227.

[313] *Id.*

64

2019.[314]   Thus, according to the SLC, Baker Hughes was incentivized to act promptly.[315]

Beattie's Actions.   The SLC identified the Conflicts Committee's assertiveness as a strength of the process leading to the 2018 Transactions.[316]  The SLC devoted a section of its report to assessing whether GE attempted to undermine the Conflicts Committee.[317]  It found there was "no evidence that GE threatened the Conflicts Committee, attempted to remove the Conflicts Committee's authority, or attempted to circumvent the Conflicts Committee's veto over the 2018 Transactions."[318]

The plaintiffs disagree.   They contend that the SLC ignored two emails suggesting that Beattie (a GE-designated Board member) was actively involved in

---

[314] *Id.* at 83-85, 228.

[315] *Id.*   The plaintiffs argue that a "smoking gun" document undermines the SLC's conclusion. Pls.' Answering Br. 76.  But the plaintiffs misrepresent and selectively quote from the relevant document.  Read in full, the document recognizes that the Conflicts Committee's leverage would end in July 2019.  It states: "OPEN QUESTION: DOESN'T THE CONFLICTS COMMITTEE HOLD ALL OF THE CARDS ANYWAY? IE. CAN'T THEY DISALLOW ANY SELLDOWN OF GE HOLDINGS UNTIL JULY 2019?" Pls.' Answering Br. Ex. 1 at -000; *see* Pls.' Answering Br. 76 (omitting the "OPEN QUESTION" text in suggesting that the statement was a definitive conclusion).

[316] SLC Rep. 231-34.  The SLC report describes the Conflicts Committee members as proactive and assertive against GE during negotiations. *Id.* at 38-41, 44-51, 54-58, 78, 134, 229-31, 274-75.

[317] *Id.* at 218-21.

[318] *Id.* at 220.

the process and sought to limit the Conflicts Committee's involvement.[319] Reasonable minds may differ about which documents the SLC should have relied on.[320] Yet neither document indicates that the SLC's conclusion was unreasonable.[321]

Simonelli's Relationship with GE. The SLC report identified Baker Hughes's negotiators—namely, CEO Simonelli and CFO Worrell—as legacy GE employees.[322] The SLC considered whether these roles created a weakness in the process, but "identified no evidence that this was the case."[323] The SLC found that these negotiators "did not pull their punches with GE negotiations" and that they were incentivized to push for Baker Hughes's best interests because they were compensated based on Baker Hughes's performance.[324]

---

[319] Pls.' Answering Br. 77.

[320] *See Carlton*, 1997 WL 305829, at *20 ("While reasonable minds might differ over any number of decisions . . . I conclude that the result as a whole is reasonable and the product of independent, informed action of directors acting in good faith.").

[321] In the first email, Beattie wrote that he would bring the Conflicts Committee "into the discussion so they feel part of it." Pls.' Answering Br. Ex. 54 at -911. In the second email, Beattie expressed his desire to avoid "negotiation." Pls.' Answering Br. Ex. 4 at -913. Beattie's statement to the SLC that "his role was limited to connecting key decision-makers so that they could work through roadblocks" is consistent with these documents. SLC Rep. 81; *see* Pls.' Answering Br. Ex. 12 (Beattie Interview Mem.) 6-9 (same).

[322] SLC Rep. 237-38.

[323] *Id.* at 238.

[324] *Id.*; *see id* at 78-79.

The plaintiffs refute this assessment, citing evidence that Simonelli worked closely with GE, Miller, and Beattie on the 2018 Transactions.[325] It is unsurprising that Simonelli communicated with his counterparty. In all, the plaintiffs' arguments amount to a dispute over how the SLC construed and weighed the available evidence, which does not create a genuine issue of fact as to the reasonableness of the SLC's conclusion.[326]

GE's Disclosures to Baker Hughes. The plaintiffs question the SLC's conclusion that the process was fair despite GE's failure to disclose material information to Baker Hughes.[327] The SLC report unequivocally states that the SLC "considered whether GE wrongfully withheld any information from [Baker Hughes]."[328] The report addresses two specific non-disclosures that the SLC

---

[325] Pls.' Answering Br. 23-30 (citing Pls.' Answering Br. Exs. 4, 57, 65-66, 69); *id.* at 77-78 (citing Pls.' Answering Br. Exs. 8-9).

[326] *See* SLC's Reply Br. 39-42 (discussing the evidence on which the SLC relied); SLC Rep. 77-78, 109, 136, 235-36, 238-39.

The plaintiffs also maintain that Simonelli's personal relationships with Beattie and Rice impaired his impartiality during negotiations. Pls.' Answering Br. 78-79. The SLC investigated this issue, and its conclusion is supported by the evidence summarized in the interview memoranda. *See* Pls.' Answering Br. Ex. 6 (Rice Interview Mem.) 6 (explaining that Simonelli "left no friends" at GE and drove a "very hard bargain."), Pls.' Answering Br. Ex. 8 (Simonelli Interview Mem.) 2-3 (describing Simonelli's relationships with Beattie and Rice).

[327] Pls.' Answering Br. 79. The plaintiffs focus on negative information about GE Power's performance in the fall of 2018. *Id.* at 26, 79.

[328] SLC Rep. 245.

identified.[329]    It also explains that "Delaware law would likely not require negotiating counterparties to disclose potential weaknesses in their financial position during arms'-length bargaining."[330]

Worrell's Job Security.  Another potential process flaw considered by the SLC involved rumors that GE might fire Simonelli.[331]  The SLC determined this issue did not affect the fairness of the process.[332]

The plaintiffs criticize the SLC for not also addressing whether GE considered firing Baker Hughes CFO Worrell, who was involved in negotiating the 2018 Transactions.[333]  This objection does not call into question the reasonableness of the SLC's conclusion.  The SLC asked Worrell whether GE pressured him in connection with the 2018 Transactions; he confirmed that GE did not.[334]  The SLC also observed that GE lacked the power to unilaterally fire Baker Hughes officers.[335]

---

[329] *Id.* at 245-47.

[330] *Id.* at 247; *see id.* at 247 n.876 (citing authorities).

[331] *Id.* at 249-52.

[332] *Id.*

[333] Pls.' Answering Br. 79-80.

[334] Pls.' Answering Br. Ex. 49 (Worrell Interview Mem.) 7 & n.6.

[335] SLC Rep. 251.

b.    Fair Price

The SLC analyzed the economic terms of the 2018 Transactions with the assistance of its advisors.  Its assessment included specific aspects of the overall deal—such as the AGT components of the amendments to the Master Agreement Framework, the HDGT Supply Agreement, the Secondary Offering, and the Repurchase.  The SLC concluded that the terms as a whole fell within the range of fairness.[336]

The plaintiffs contend that this conclusion "suffers from multiple flaws," mostly due to purported shortcomings in Brattle's analysis.[337]  Their objections ignore that the SLC was entitled to rely on Brattle and to evaluate Brattle's analyses with advice from the SLC's counsel.  The plaintiffs' arguments are also unsupported, and none raise a genuine issue of material fact about the reasonableness of the SLC's conclusion that the price was fair.

The SLC's Frame of Reference.  The SLC determined that the appropriate frame of reference for its analysis was a comparison between the economic terms of the 2018 Transactions and those Baker Hughes "would likely have received in an arms'-length negotiation with GE (or another turbine supplier) *after* the Trigger Date

---

[336] *See id.* at 253-89.

[337] Pls.' Answering Br. 80.

occurred."[338]  The plaintiffs insist that the SLC should have compared the terms of the amended Master Agreement Framework to the original Master Agreement Framework.[339]

Irrespective of its accuracy, the SLC's approach was reasonable.  The SLC report explained that parts of the original Master Agreement Framework would expire at or near the Trigger Date.  "After the Lockup expired on July 3, 2019, [Baker Hughes] could not prevent the Trigger Date."[340]  The SLC also interviewed multiple witnesses who supported the SLC's frame of reference.[341]

The plaintiffs fault this approach because the SLC did not identify any contemporaneous model from 2018 that adopted it, other than a Boston Consulting Group report commissioned by GE "in support of GE Aviation's proposed [AGT] pricing."[342]  But the SLC merely considered the Boston Consulting Group report to

---

[338] SLC Rep. 256 (emphasis in original).

[339] Pls.' Answering Br. 82; *cf.* SLC Rep. 253-58, 262.  The SLC and Brattle also considered the terms Baker Hughes might receive from non-GE suppliers.  *See* SLC Rep. 87-88, 115, 256 58, 267-68, 287-88; Hutchings Dep. 175, 275-76.  "[W]itnesses uniformly stated that [Baker Hughes] could not have changed turbine manufacturers in the short term without exposing itself to significant risk."  SLC Rep. 267.

[340] SLC Rep. 255.

[341] *Id.*

[342] *Id.* at 104, 257-58; *see also* Pls.' Answering Br. Ex. 3.

70

be "helpful" and accounted for its potential biases.[343]  According to the SLC report, the AGT pricing margins Baker Hughes negotiated in the Master Agreement Framework amendments were "significantly lower than the margins BCG identified as 'market' or 'more optimal [for GE].'"[344]

The SLC further considered a contemporaneous internal analysis that Baker Hughes used to evaluate a hypothetical "no deal" scenario, in which Baker Hughes could not extend the supply agreements for AGTs and HDGTs before the Master Agreement Framework terminated.[345]  This scenario was "pretty close" to the SLC's frame of reference.[346]  Compared to the projected financial effect of the Master Agreement Framework amendments, the "no deal" scenario "reflected substantially lower financial performance for [Baker Hughes]."[347]

---

[343] SLC Rep. 258, 264-65; *see* Pls.' Answering Br. Ex. 7 (Godsman Interview Mem.) 5 & n.5 (GE Aviation executive describing his view that the Boston Consulting Group report was unfavorable to GE Aviation in some respects).

[344] That is, the AGT pricing margins in the 2018 Transactions were more favorable to Baker Hughes than those margins identified as "market" or "more optimal" in the Boston Consulting Group report.  SLC Rep. 264-65.

[345] *See id.* at 91-93, 256-58; Jannis Interview Mem. 8.

[346] Hutchings Dep. 312.  The "no deal" scenario was arguably optimistic compared to the SLC's frame of reference because the former assumed that Baker Hughes still had free, total access to GE intellectual property.  In other words, if the 2018 Transactions compared favorably to the "no deal" scenario, they would also compare favorably to the SLC's frame of reference.  *See* SLC Rep. 257.

[347] *Id.*

Brattle's "Bifurcated" Analysis. Brattle tasked different experts with addressing the Capital Markets Transactions and the amendments to the Master Agreement Framework.[348] The plaintiffs submit that this approach meant Brattle's economic analysis of the amendments did not consider Baker Hughes's leverage in negotiating the Capital Markets Transactions.[349] The record shows, however, that Brattle considered the negotiating parties' relative leverage.[350] The SLC reasonably relied on each Brattle expert and drew conclusions about Baker Hughes's leverage based on the record as a whole.[351]

Damages from the Capital Markets Transactions. The SLC report explains that Baker Hughes prevailed on all negotiating points affecting the Capital Markets Transactions, including the key issue of the Repurchase price.[352] The SLC determined that the Repurchase occurred at a favorable time because a drop in Baker Hughes's stock price lowered its repurchase price and limited the amount of stock

---

[348] Hutchings Dep. 277-81, 295-96; Smith Dep. 194-95.

[349] Pls.' Answering Br. 80.

[350] *See* Hutchings Dep. 276-80; Ebel Dep. 131-33; SLC Rep. 112, 269, 273-75, 289. The minutes of the penultimate SLC meeting state that Brattle representatives "summarized their analyses of the amendments to the Master Agreement Framework, including their analyses of . . . evidence concerning the parties' relative leverage in negotiations." Pls.' Answering Br. Ex. 109 at 1.

[351] *See* SLC Rep. 112, 269.

[352] *Id.* at 132-39, 273-83; *see also* Smith Dep. 196-97.

GE would sell in the Secondary Public Offering.[353] The Repurchase also minimized downward pressure on Baker Hughes stock from the Secondary Public Offering.[354] The SLC further found that the Capital Markets Transactions worked toward addressing the GE overhang on Baker Hughes stock, and that GE's liquidity needs enabled Baker Hughes to obtain beneficial amendments to the Master Agreement Framework.[355]

Despite this record, the plaintiffs contend that the SLC's economic analysis lacks a reasonable foundation because Brattle did not perform a damages analysis of the Capital Markets Transactions.[356] Brattle's expert testified that it "did not quantify damages because [Brattle] did not come to a financial or economic opinion that there were damages."[357] The plaintiffs' disagreement with this opinion does not amount to a meritorious challenge to the SLC's conclusion.

### c. The Decision to Terminate the Action

Because it determined that the 2018 Transactions fell within the range of fairness, the SLC concluded the derivative claims asserted against GE and the

---

[353] SLC Rep. 132, 149-50, 279 n.978.

[354] *Id.* at 129-30; Smith Dep. 220-22.

[355] SLC Rep. 34-35, 42-44, 129-30, 133-36, 269, 275-79.

[356] Pls.' Answering Br. 80-81.

[357] Smith Dep. 204; *see also id.* at 209-11.

remaining director defendants "were unlikely to have value" as a litigation asset of Baker Hughes.[358]   The SLC also considered the monetary, operational, and reputational costs associated with continued litigation.[359]   On balance, the SLC determined that terminating the Action would best serve Baker Hughes and its stockholders.[360]

The plaintiffs insist that this conclusion was unreasonable because the SLC did not value the plaintiffs' claims.[361]   There is no requirement that an SLC conduct an expected-value calculation.[362]   Even if there were some potential for a positive monetary recovery, the SLC was not obliged to pursue the litigation if its good faith judgment indicated that doing so was not best for the corporation.[363]   "The whole point of recognizing the board's authority and responsibility in this context is to

---

[358] SLC Rep. 290, 292, 305-06, 319; *see also id.* at 226, 319.

[359] *Id.* at 316-19; *see supra* at 23 (describing factors considered by the SLC).

[360] *Id.* at 320; *see id.* at 316-20.

[361] Pls.' Answering Br. 69-70.

[362] If anything, the SLC would have valued the recoverable monetary damages to be zero because it concluded that the 2018 Transactions likely fell within the range of fairness. *See* SLC Rep. 290, 305-06, 319-20; Smith Dep. 204, 209-11.

[363] *Carlton*, 1997 WL 305829, at *11 ("[T]he SLC is not required to attempt to maximize returns from the lawsuit.").   Parties often settle entire fairness cases after the pleadings stage if defense costs exceed a settlement payment.

allow the board's judgment *concerning what is in the long-run best interest of the corporation* to be acted upon."[364]

## B.     The Second *Zapata* Step

"Proceeding to the second step of the *Zapata* analysis is wholly within the discretion of the court."[365]  If the court chooses to do so, it applies "its own business judgment to the facts to determine whether the corporation's best interests would be served by dismissing the suit."[366]  "The second step is intended to thwart instances where corporate actions meet the criteria of [*Zapata*'s] step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest."[367]

I have carefully reviewed the evidentiary record and, after an exhaustive analysis, determined that the SLC has met its burden under step one of *Zapata*.  The SLC has demonstrated its independence, that its process was thorough and unbiased,

---

[364] *Id.* (emphasis in original).

[365] *Kaplan*, 499 A.2d at 1192; *see also Diep*, 280 A.3d at 158.

[366] *London*, 2010 WL 877528, at *11.

[367] *Kaplan*, 484 A.2d at 508; *see Biondi*, 820 A.2d at 1164 n.40 ("Although this is said to be an oxymoronic judicial exercise of 'business judgment,' its purpose is to provide a safeguard against the danger that the difficult-to-detect influence of fellow-feeling among directors (*i.e.*, so-called 'structural bias') does not cause cessation of meritorious litigation valuable to the company.").

and that its conclusions rest on reasonable bases. I have no reason to believe that termination of the litigation is "'irrational' or 'egregious' or some other extreme word."[368] Accordingly, I decline to conduct an independent evaluation of the merits.[369]

## III. CONCLUSION

The SLC has met its burden of proof. The SLC's motion to terminate the Action is therefore granted.

---

[368] *Carlton*, 1997 WL 305829, at *2 (describing the "conceptual[] difficult[y]" of *Zapata*'s second step as "designed to offer protection for cases in which, while the court could not consciously determine on the first leg of the analysis that there was no want of independence or good faith, it nevertheless 'felt' that the result reached" was unsound); *see also Kindt II*, 2003 WL 21453879, at *5.

[369] *See Kikis*, C.A. No. 9654-CB, at 106-07 (explaining, in an entire fairness action, that the court was "not . . . compelled" to conduct a *Zapata* step two analysis after concluding the special litigation committee satisfied step one).